

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JMK:DCP/JPM/JPL/GMM
F. #2017R01739

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 22, 2019

<u>By Hand and ECF</u>

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Michael L. Cohen
               <u>Criminal Docket No. 17-544 (NGG)</u>

Dear Judge Garaufis:

      The government respectfully submits this letter to notify the Court of significant conflicts of interest involving Ronald G. White, Esq., who represents the defendant Michael L. Cohen. The conflicts of interest arise from Mr. White's involvement as a fact witness to the defendant's inculpatory statements and the risk that Mr. White may be a witness at trial in this matter. As set forth below, even if the defendant were willing to waive the conflicts posed by Mr. White's representation in accordance with the procedures set forth in <u>United States v. Curcio</u>, 680 F.2d 881 (2d Cir. 1982), the government respectfully requests that the Court decline to accept such waivers.

      Should the Court conclude that disqualification is not mandatory, the government requests that the Court schedule and conduct a hearing pursuant to <u>United States v. Curcio</u> at the next scheduled appearance on April 2, 2019. At that hearing, the defendant should be permitted to consult with independent <u>Curcio</u> counsel and the Court should obtain the defendant's waiver of the conflicts of interest raised herein. If the Court so requests, the government will submit a suggested <u>Curcio</u> colloquy.

BACKGROUND

      On October 5, 2017, the defendant was charged in a ten-count indictment with conspiracy to commit investment adviser fraud, in violation of 18 U.S.C. § 371; investment adviser fraud, in violation of 15 U.S.C. §§ 80b-6, 80b-14 and 80b-17; conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; four counts of wire fraud, in violation of 18

U.S.C. § 1343; conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k); obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2); and making material false statements, in violation of 18 U.S.C. § 1001(a)(2). The fraud charges in the indictment concern a December 2010 stock purchase that the defendant arranged while employed as a senior executive at U.S. hedge fund Och-Ziff Capital Management Group, LLC ("Och-Ziff"). The obstruction and false statement charges relate to alleged acts the defendant took during Securities & Exchange Commission ("SEC") and grand jury investigations of Och-Ziff.

By way of background, beginning in approximately 2007 and continuing through the commencement of the SEC's investigation in June 2011, Och-Ziff participated in a joint venture investment company called Africa Management Limited ("AML"). ECF No. 1: Indictment ¶¶ 7, 28. AML invested in Africa-related mining and natural resource companies via two investment funds—African Global Capital I and II (respectively, "AGC I" and "AGC II," and referred to collectively as "AGC"). Id. The principal limited partner, or outside investor, in AGC II was a United Kingdom based charitable trust (the "Charitable Foundation").

In December 2010, AGC II purchased approximately $20 million in shares of a company called Strata Limited ("Strata"). Id. ¶¶ 3, 25. The Indictment alleges that the defendant, who was a principal decision maker for AGC II, along with another individual identified as Co-Conspirator 2 ("CC-2"), had personal interests in the transaction that he failed to disclose or misrepresented to the Charitable Foundation. Id. ¶¶ 3, 13-14, 17-19. Specifically, Co-Conspirator 1 ("CC-1"), one of the sellers of Strata shares to AGC II, owed the defendant approximately $20 million at the time the defendant arranged the share purchase from CC-1. Additionally, the defendant is further alleged to have arranged for CC-1 to take and sell CC-2's shares of Strata and then pass the proceeds of the sale back to CC-2. Id. ¶¶ 15-16, 27.

The SEC commenced an investigation of Och-Ziff in mid-2011, followed by the commencement of a grand jury investigation in this District by January 2013. The defendant's relationship with CC-1 was a focus of both the SEC's and grand jury's investigations, and a subject of a subpoena the SEC issued to Och-Ziff. The Indictment alleges that, in or about March 2012, the defendant sought to obstruct the SEC's investigation of his relationship with CC-1 and the December 2010 Strata share sale. Id. ¶¶ 4, 28-35. The defendant asked CC-1 to create a backdated letter (the "Backdated Letter") which, in short, purported to absolve the defendant of personal conflicts of interest he had in the Strata transaction. Id. ¶¶ 32-33. In September 2012, Mr. White, on behalf of the defendant, produced the Backdated Letter to the SEC. Id. ¶ 32.

On May 30, 2013, the defendant, with the assistance of Mr. White and another attorney from the same law firm, met with Special Agents of the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service, Criminal Investigation ("IRS"), as

well as attorneys for the government, for an interview pursuant to a proffer agreement.[1]  Id. ¶ 35.  The Indictment alleges that, during the interview, the defendant falsely stated that the Backdated Letter was not backdated and that he had received it from CC-1 in October 2010, the date printed on the letter.  Id. ¶ 35.  The defendant also falsely told the government that he had received the letter in 2010 after speaking with CC-1 about buying CC-1's Strata shares.  In addition, the defendant falsely stated that CC-1 told the defendant that CC-1 would write a letter to the defendant stating that CC-1 would not use the proceeds of the Strata stock sale to repay the defendant on an outstanding loan that the defendant provided to CC-1 in connection with CC-1's purchase of a luxury yacht.

On June 3, 2013, Mr. White contacted the government and a representative of the SEC by e-mail and wrote that there was a "follow-up issue from [the defendant's] interview on Thursday that I need to discuss with you."  Later that day, the government, including an FBI agent, participated in a telephone conversation with Mr. White.  The participants on the call, as announced to the FBI, were two prosecutors, an SEC attorney, an FBI agent, and Mr. White.[2]  Mr. White related, in sum and substance, that the defendant, after returning home from Brooklyn to the United Kingdom, called Mr. White and told Mr. White that the defendant wished to correct statements that he made during the proffer session.  Mr. White said that the defendant had authorized Mr. White to speak to the government on the defendant's behalf.

Mr. White further stated that the defendant had told him that CC-1 had not provided the Backdated Letter to the defendant in October 2010, as the defendant had stated during the proffer.  Mr. White said that the defendant and CC-1 had a verbal agreement at that time, and that the defendant instead received the Backdated Letter in March 2012.  Mr. White stated that in March 2012, CC-1 had come to Och-Ziff's office and offered to provide the defendant with a letter, stating he would not repay the defendant with proceeds from the Strata sale.  Mr. White stated that the defendant said that CC-1 later invited the defendant to his home, where CC-1 gave the defendant the Backdated Letter and assured the defendant that the proceeds CC-1 had used to repay the defendant had not come from the Strata sale.  Mr. White stated that the defendant saw that the letter was backdated to 2010.  After Och-Ziff received a subpoena, the defendant provided the letter to in-house counsel at Och-Ziff.

Finally, Mr. White stated that the defendant had not accurately described his communications with a mutual acquaintance of the defendant and CC-1.  During the proffer, the defendant denied having any recent contact with CC-1 or trying to contact CC-1.  Mr. White stated that the defendant had, in fact, given the acquaintance a note to give to CC-1.

---

[1] Representatives of the SEC were also present during the interview.

[2] During a recent conversation between the government and Mr. White, Mr. White represented to the government that another attorney from his law firm had also been on this telephone call.

3

Mr. White stated that the note said that lawyers did not have the original letter that CC-1 gave to the defendant.

After the May 2013 proffer session and Mr. White's follow-up disclosures on behalf of the defendant, the defendant retained a second law firm, Kramer Levin Naftalis & Frankel LLP, to represent him in connection with this matter. The defendant is currently represented by both Mr. White's firm and Kramer Levin. To the best of the government's knowledge and belief, the conflicts of interest discussed herein do not extend to Kramer Levin. For that reason, the government also respectfully suggests that Kramer Levin could appropriately serve as independent Curcio counsel.

## DISCUSSION

I.  Applicable Law

    A.  Overview

A defendant has a Sixth Amendment right to conflict-free legal representation. See United States v. Levy, 25 F.3d 146, 152 (2d Cir. 1994); United States v. Schwarz, 283 F.3d 76, 90-97 (2d Cir. 2002). Although the Sixth Amendment encompasses a defendant's right to counsel of his choice, its "essential aim" is to provide "an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159 (1988); accord United States v. Jones, 381 F.3d 114, 119 (2d Cir. 2004) ("The Sixth Amendment guarantees a criminal defendant an effective advocate, not necessarily the advocate of his or her choosing."). "In deciding a motion for disqualification, the district court recognizes a presumption in favor of the accused's chosen counsel, although this presumption can be overcome by a showing of an actual conflict or potentially serious conflict." United States v. Locascio, 6 F.3d 924, 931 (2d Cir. 1993).

Accordingly, when a district court receives notice that defense counsel may be burdened by a conflict of interest, the court must "investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." Levy, 25 F.3d at 153; see also United States v. Kliti, 156 F.3d 150, 153 (2d Cir. 1998). If the district court determines that defense counsel has an actual or potential conflict, the court has a "disqualification/waiver obligation" to determine whether the conflict is so severe as to obligate the court to disqualify the attorney or a lesser conflict that can be waived in a Curcio hearing. Kliti, 156 F.3d at 153 (citing Levy, 25 F.3d at 153). An actual conflict exists "when the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action, or when the attorney's representation of the defendant is impaired by loyalty owed to a prior client." Jones, 381 F.3d at 119 (internal quotation marks and citations omitted). A potential conflict arises if "the interests of the defendant could place the attorney under inconsistent duties in the future." Id. (emphasis and citations omitted).

4

If the inquiry reveals that an attorney suffers from an actual or potential conflict of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation, the court must disqualify that attorney. See United States v. Lussier, 71 F.3d 456, 461 (2d Cir. 1995). If a conflict is such that a rational defendant could knowingly and intelligently choose to continue to be represented by the conflicted attorney, the court must obtain directly from the defendant a valid waiver in accordance with the procedures set forth in Curcio. See, e.g., United States v. Malpiedi, 62 F.3d 465, 470 (2d Cir. 1995); Levy, 25 F.3d at 153; United States v. Iorizzo, 786 F.2d 52, 58-59 (2d Cir. 1986). In summarizing Curcio procedures, the Second Circuit has instructed the trial court to:

> (i) advise the defendant of the dangers arising from the particular conflict; (ii) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them; and (iii) give the defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel.

Iorizzo, 786 F.2d at 59; see also Curcio, 680 F.2d at 888-90. By relying on waivers of potential conflict claims, courts are spared from having to wade into the intricacies of those claims. United States v. Jiang, 140 F.3d 124, 128 (2d Cir. 1998).

The court also has the discretion to disqualify an attorney even where it is not mandated under the law. Regardless of the severity of the conflict or the defendant's willingness to waive the conflict, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat, 486 U.S. at 160. "The question of [attorney] disqualification therefore implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial." Locascio, 6 F.3d at 931. Accordingly, "a district court should decline to permit a defendant to be represented by the counsel of his choice if that representation would undermine the integrity of the judicial process." United States v. DiPietro, No. 02 CR 1237 (SWK), 2004 WL 613073, at *5 (S.D.N.Y. Mar. 29, 2004) (citing Wheat, 486 U.S. at 163).

The need for a Curcio hearing exists regardless of whether a case is disposed of by way of guilty plea or trial. "A claim that counsel is conflicted is in essence a claim of ineffective assistance of counsel." United States v. Stantini, 85 F.3d 9, 15 (2d Cir. 1996). Likewise, "[e]ffective assistance of counsel includes counsel's informed opinion as to what pleas should be entered." Boria v. Keane, 99 F.3d 492, 497 (2d Cir. 1996). Therefore, it necessarily follows that a defendant has a right to conflict-free representation during the plea negotiation stage. See id. ("[P]rior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered.") (quoting Von Moltke v. Gillies, 332 U.S. 708, 721 (1948)); see also Stantini, 85 F.3d at 16-17 (suggesting

5

that ineffective assistance of counsel may be shown if attorney's dual representation led to inadequate advice "with respect to the advantages or disadvantages of a plea").

  B. <u>Advocates as Witnesses</u>

    Lawyers are generally barred from acting as both an advocate and a witness in the same proceeding. <u>See</u> Model Rules of Professional Conduct Rule 3.7(a); <u>Kliti</u>, 156 F.3d at 156 n.8 ("If [the defense attorney] were to be a sworn witness, he should be disqualified as the trial attorney."); <u>see also</u> Gordon Mehler, <u>et</u> <u>al.</u>, Federal Criminal Practice: A Second Circuit Handbook § 8-6 (17th ed. 2017). "The risk that [a lawyer will] become a witness at trial [is] enough alone to . . . reach this determination [to disqualify] under an abuse of discretion standard," <u>Jones</u>, 381 F.3d at 121, provided that the testimony at issue is squarely relevant. <u>See</u> <u>United States v. Kwang Fu Peng</u>, 766 F.2d 82, 87 (2d Cir. 1985).

    In <u>Kliti</u>, the Second Circuit vacated a conviction and ordered a new trial where it became apparent during the trial that the defense attorney could have been called as a fact witness to support his client's defense, but was not permitted to testify, and where the court did not obtain a <u>Curcio</u> waiver from the defendant. <u>See</u> <u>Kliti</u>, 156 F.3d at 155-57. Specifically, during the government's direct case, the government called an accomplice witness to provide evidence of the defendant's participation in the charged counterfeit check scheme. <u>See id.</u> at 155. During cross-examination, the accomplice witness denied ever telling Kliti, Kliti's attorney Sarikas, and a third party that Kliti had "absolutely nothing to do with" the counterfeit check scheme. <u>Id.</u> at 155-56. Defense counsel explained to the court, out of the jury's presence, that the accomplice witness had, in fact, made that statement. <u>See id</u>. at 155. However, because Kliti chose not to testify at trial and because the third party invoked his Fifth Amendment privilege and refused to testify, Sarikas was the only other witness who could be called to refute the accomplice's version of events. <u>See id.</u> at 155-56. At that point, Sarikas was "in a clear conflict because he was faced with the choice of (1) testifying on behalf of his client, which would result in his disqualification, or (2) not presenting evidence of the exculpatory statement." <u>Id.</u> at 156 (footnote omitted). A <u>Curcio</u> hearing was neither requested nor undertaken, Sarikas did not testify, and the defendant was convicted.

    The Second Circuit vacated the conviction. Under the above-described circumstances, the district court

> was obligated to question Kliti, in accordance with <u>Curcio</u>, to determine whether he was willing to waive his right to a conflict-free lawyer and to forgo confronting [the accomplice witness] with the exculpatory statement through the testimony of Sarikas. The [district] court should have explained to Kliti that Sarikas could not be a witness — sworn or unsworn — while Sarikas was representing Kliti, but that if Kliti were represented by another

6

>attorney, that attorney would be able to call Sarikas as a witness and have him testify about the statement.

Id. at 156-57.

"Courts have also considered disqualification where the chosen counsel is implicated in the allegations against the accused and could become an unsworn witness for the accused." Locascio, 6 F.3d at 931 (citing United States v. Arrington, 867 F.2d 122, 129 (2d Cir. 1989)). "An attorney acts as an unsworn witness when his relationship to his client results in his having first-hand knowledge of the events presented at trial." Locascio, 6 F.3d at 933. Irrespective of whether the attorney is actually called as a witness, "he can still be disqualified, since his performance as an advocate can be impaired by his relationship to the events in question . . . . Moreover, his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." Id. (collecting cases).

For example, in Locasio, the appeal of John Gotti's conviction, Gotti's first choice of counsel had been present during discussions surreptitiously recorded by the government. As the Second Circuit wrote, affirming Judge Glasser's disqualification, "[t]he clearest support for [the district court's] finding was Cutler's presence during . . . discussions taped by the government. The government was legitimately concerned that, when Cutler argued before the jury for a particular interpretation of the tapes, his interpretation would be given added credibility due to his presence in the room when the statements were made." Id. at 934. The court wrote that an attorney could frame his own views as legal argument, which "would have given Gotti an unfair advantage, since Cutler would not have had to take an oath in presenting his interpretation." Id.

The Second Circuit has noted that agreeing "to limit inquiry to avoid the problem of counsel as an unsworn witness may be appropriate in some circumstances," Kliti, 156 F.3d at 156 n.7 (reversing conviction for failure to hold Curcio hearing to determine if defendant consented to limiting cross-examination), or that a stipulation may be used to avoid disqualification of an advocate-witness. Torres v. Donnelly, 554 F.3d 322, 326 (2d Cir. 2009) (conflict negated by stipulation that obviated need for defense counsel's testimony).

However, where defense counsel is entangled in the facts of the defendant's case such that he should either be available as a witness or would, upon remaining as defense counsel, "become an unsworn witness for the accused," it is counsel's ethical duty to withdraw, and upon failing to do so, counsel should be disqualified, regardless of the defendant's expressed willingness to waive. Locascio, 6 F.3d at 931-34. "When an attorney is an unsworn witness . . . the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired." Id. at 934. Thus, "[w]aiver by the defendant is ineffective in curing the impropriety in such situations, since he is not the party prejudiced." Id. at 934.

Finally, in cases where, as here, multiple conflicts have been raised, "each cannot be considered in isolation, but rather must be considered together when assessing whether there is a congruence of interests between the lawyer and his client." United States v. Rahman, 861 F. Supp. 266, 274 (S.D.N.Y. 1994) (citing Levy, 25 F.3d at 157).

II.     Analysis

The Court should exercise its discretion and disqualify Mr. White from representing the defendant because there is a significant risk that Mr. White will be called to testify at trial. According to his statements to the government, Mr. White is a first-hand witness to the defendant's statements during multiple telephone calls that occurred between May 30, 2013 and June 3, 2013. Mr. White's potential testimony about those conversations, wherein the defendant made numerous admissions and then authorized Mr. White to share those admissions with the government on his behalf, which Mr. White then did, is direct evidence of multiple crimes charged in the Indictment.

According to Mr. White, the defendant admitted that the statements he made during the proffer needed to be corrected. The defendant provided Mr. White with a new timeline of events and narrative concerning the genesis of the Backdated Letter. Mr. White told the government that, contrary to what the defendant told federal law enforcement agents during the proffer, the defendant admitted that he and CC-1 discussed creating the Backdated Letter, and that CC-1 created the letter and gave it to the defendant approximately 18 months later than the defendant had originally represented. Thus, the Backdated Letter was created during the pendency of the SEC investigation and falsified to appear as if it was an authentic pre-existing document, which purported to absolve the defendant of certain conflicts of interest under investigation. Details that the defendant apparently provided to Mr. White during their conversations, which Mr. White then communicated to the government, such as the locations where the defendant discussed and later obtained the letter, are relevant trial evidence. Mr. White stated that the defendant told him that the defendant knew the letter was backdated when he received it from CC-1. Then, because Och-Ziff received an SEC subpoena, the defendant gave the letter to in-house counsel at Och-Ziff, knowing that it was false. Furthermore, Mr. White said that the defendant characterized the statements he made during the proffer as needing correction—a clear admission from the defendant that he had been untruthful. Mr. White also offered his own observations of the defendant's demeanor and conduct that would be relevant evidence at trial.

As presently known to the government, Mr. White was the only witness to the phone conversations with the defendant once the defendant returned to the United Kingdom, made various admissions to Mr. White, and authorized Mr. White to disclose those admissions to the government. Accordingly, there is a significant possibility that Mr. White will be called by the government as a witness at trial, which presents a meaningful conflict of interest. Additionally, under these circumstances, at trial, the defendant may even seek to impeach Mr. White about these or other conversations between the defendant and Mr. White.

8

Notably, the statements at issue here are of significant import to the factual questions for the jury. Counts Eight and Nine of the Indictment are based on both the provision of the Backdated Letter to the SEC and the later false statements that the defendant made when he lied about the authenticity of the Backdated Letter. Count Ten, which charges material false statements under Section 1001, relates specifically to the defendant's conduct during the May 30, 2013 proffer session. Thus, the testimony of Mr. White is not of "merely tangential importance to the trial." Kwang Fu Peng, 766 F.2d at 87.[3]

Moreover, the potential scope of Mr. White's testimony is not necessarily limited to his telephone call with the government. During the preceding proffer, the defendant made numerous false statements to the government. Therefore, during trial, the government intends to offer evidence of the defendant's proffer statements, as permitted under the terms of the proffer agreement. Even without Mr. White's June 3, 2013 statements to the government contradicting his client's proffer statements, Mr. White's presence at the proffer session presents another conflict of interest, which is further heightened by the fact that these false statements are direct evidence of the crimes alleged in Counts Eight through Ten of the Indictment. Indeed, an attorney's mere presence during conversations of a defendant that are relevant to a trial may provide a basis for disqualification. See Locascio, 6 F.3d at 934.

With respect to the statements given during the proffer, although the government need not call Mr. White as a witness to prove these facts, which would provoke his disqualification as trial counsel, see Kliti, 156 F.3d at 156 n.8 (citing cases), the defendant might wish to call his counsel as a witness on his behalf to contradict the government's proof of what the defendant said during the meeting. While many conflicts of interest by Mr. White's continued representation of the defendant are already apparent, it seems that additional conflicts of interest, currently unforeseen, will likely materialize as the case progresses. See Wheat, 486 U.S. at 162-63 ("The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.").

In light of the myriad conflicts that would arise if Mr. White were to continue to represent the defendant, the government respectfully submits that its interests in ensuring a just verdict and a fair trial, as well as the interests of the Court in preserving the integrity of the judicial process, outweigh the defendant's interest in continuing to retain Mr. White as counsel in this case.

Should the Court decide not to disqualify Mr. White, the government respectfully requests that the Court hold a Curcio hearing to explore with the defendant these actual or potential conflicts of interest, and then determine whether the defendant would

---

[3] The Backdated Letter is also itself evidence as to the underlying fraud charges charged in Counts One through Seven—a post hoc effort to cover up the fact that the defendant was paid $4 million from proceeds of the Strata sale.

9

prefer to preserve his right to call defense counsel as a witness at trial (thus necessitating his disqualification) or to forgo his ability to call him as a witness at trial (thus retaining him as his trial counsel). In this connection, the defendant should be afforded an opportunity to explore what, if any, testimony his attorney could offer on his behalf in response to the testimony of the investigators. The Court could then determine whether the defendant is prepared to knowingly and intelligently waive these actual or potential conflicts of interest and, if so, whether to accept such a waiver.

## CONCLUSION

For the foregoing reasons, the Court should exercise its discretion under Wheat and disqualify Mr. White from representing the defendant. Should the Court decide not to disqualify Mr. White, and if the Court so requests, the government will submit a suggested Curcio colloquy.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By: /s/
David C. Pitluck
James P. McDonald
Jonathan P. Lax
Assistant U.S. Attorneys
(718) 254-7000
Gerald M. Moody, Jr.
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
(202) 616-4988

cc: All Counsel of Record (by ECF)