UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

UNITED STATES

         -against-

MICHAEL L. COHEN,

               Defendant.

-------------------------------------------------------------- x

Docket No.  17 CR 544 (NGG)


**SENTENCING MEMORANDUM ON BEHALF OF**
**DEFENDANT MICHAEL L. COHEN**

Paul H. Schoeman
KRAMER, LEVIN, NAFTALIS &
FRANKEL, LLP
1177 Avenue of the Americas
New York, NY  10036
(212) 715-9264
Counsel for Defendant Michael L. Cohen

Ronald G. White
Amanda Aikman
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
(212) 468-8016
Counsel for Defendant Michael L. Cohen

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................II

FACTUAL BACKGROUND ..................................................................................................... 3

1.   PERSONAL HISTORY....................................................................................................... 3

2.   THE NATURE OF THE OFFENSE ................................................................................. 18

LEGAL ANALYSIS................................................................................................................ 22

1.   THE ADVISORY SENTENCING GUIDELINE RANGE.............................................. 22

2.   THE COURT'S EXPANSIVE SENTENCING DISCRETION..................................... 23

3.   ANALYSIS OF THE SECTION 3553(A) FACTORS ................................................... 24

    A.   The Nature and Circumstances of the Offense ................................................. 25

    B.   History and Characteristics of the Defendant ..................................................... 29

        1.   Mr. Cohen is a First-Time Offender Who Has Led An Otherwise Positive Life ................................................................................................. 30

    C.   A Probationary Sentence Would Reflect the Seriousness of the Offense and Provide Adequate Deterrence ...................................................................... 36

        1.   A Probationary Sentence Would Properly Reflect the Seriousness of the Offense................................................................................................ 36

        2.   In Light of the Substantial Collateral Consequences Suffered by Mr. Cohen, a Probationary Sentence Will Provide Just Punishment....... 38

        3.   A Probationary Sentence Will Afford Adequate Deterrence.................. 43

    D.   The Court Should Employ Alternatives to Incarceration .................................... 44

    E.   Sentencing Statistics Indicate A Probationary Sentence is Appropriate for Mr. Cohen ....................................................................................................... 47

    F.   Imposing a Prison Sentence On Mr. Cohen Would Create Unwarranted Sentencing Disparities ........................................................................................ 48

CONCLUSION........................................................................................................................ 49

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Gall v. United States*,
  552 U.S. 38 (2007)...................................................................................30, 37

*Kimbrough v. United States*,
  552 U.S. 85 (2007)...................................................................................23, 30

*Koon v. United States*,
  518 U.S. 81 (1996)........................................................................................23

*Pepper v. United States*,
  562 U.S. 476 (2011)......................................................................................29

*U.S. v. Ovid*,
  09 CR 216 (JG), 2010 WL 3940724 (E.D.N.Y. October 1, 2010) .........................30

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006),
  *aff'd in part*, 237 F. App'x 713 (2d Cir. 2007)................................................30, 35

*United States v. Block*,
  16 CR 595 (S.D.N.Y. Nov. 8, 2017) ECF No. 169..........................................35, 43

*United States v. Bonds*,
  07 CR 732 (SI) (N.D. Cal. Dec. 27, 2011) ECF No. 425 ..................................28, 44

*United States v. Bonds*,
  784 F.3d 582 (9th Cir. 2015) ...........................................................................28

*United States v. Collins*,
  07 CR 1170 (S.D.N.Y. July 15, 2013) ECF No. 244............................................43

*United States v. Connolly*,
  16 CR 370 (CM) (S.D.N.Y. Oct. 24, 2019) ECF No. 425.................................44, 46

*United States v. Coughlin*,
  No. 06-20005, 2008 U.S. Dist. Lexis 11263 (W.D. Ark. Feb. 1, 2008) .................37

*United States v. Curtler*,
  15 CR 670 (CM) (S.D.N.Y. April 9, 2019) ECF No. 28 .......................................46

*United States v. DiAmbrosio*,
04 CR 66, 2008 WL 732031 (E.D. Pa. March 13, 2008)............................................35, 37, 43

*United States v. Dorvee*,
616 F.3d 174 (2d Cir. 2010)........................................................................................23

*United States v. Gardellini*,
545 F.3d 1089 (D.C. Cir. 2008)..................................................................................46

*United States v. Johnson*,
16 CR 457 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 26, 2016).......................23, 30, 42, 44

*United States v. Johnson, et al.*,
16 CR 457 (E.D.N.Y. Oct. 23, 2018) ECF No. 259 ......................................................34

*United States v. Jones*,
460 F.3d 191 (2d Cir. 2006)........................................................................................24

*United States v. Khalid*,
09 CR 734, 2011 WL 6967993 (E.D.N.Y. Dec. 13, 2011)..............................................35

*United States v. Mateo*,
299 F. Supp. 2d 201 (S.D.N.Y. 2004)..........................................................................45

*United States v. Rafal*,
17 CR 10004 (D. Mass. April 20, 2017) ECF No. 19.....................................................26

*United States v. Robson*,
14 CR 272 (S.D.N.Y. Nov. 21, 2016) ECF No. 267.......................................................46

*United States v. Rogers*,
972 F.2d 489 (2d Cir. 1992)........................................................................................24

*United States v. Saltsman*,
07 CR 641 (E.D.N.Y. July 28, 2010) ECF No. 163......................................... *passim*

*United States v. Santiago*,
13 CR 039 (CM) (S.D.N.Y. Oct. 9, 2014) ECF 114.................................................26, 27

*United States v. Schulman*,
16 CR 442 (E.D.N.Y. Sept. 26, 2017) ECF No. 155 .................................................30, 35, 42

*United States v. Schulte*,
  10 CR 455 (D. Colo. May 14, 2012) ECF No. 279 .........................................27, 28

*United States v. Singh*,
  877 F. 3d 107 (2d Cir. 2017)....................................................................................24

*United States v. Stern*,
  590 F. Supp. 2d 945 (N.D. Ohio 2008)....................................................................37

*United States v. Stewart*,
  14 CR 272 (S.D.N.Y. Feb. 8, 2017 and Feb. 22, 2017) ECF Nos. 275, 277 ..........46

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009)................................................................................25, 42

*United States v. Toback*,
  01 CR 410, 2005 WL 992004 (S.D.N.Y. April 14, 2005).......................................36

*United States v. Tomasetta*,
  No. 10 CR 1205 (JSR) (S.D.N.Y. Nov. 1, 2013) ECF No. 293.........................28, 29

*United States v. Walker*,
  252 F. Supp. 3d 1269 (D. Utah 2017)......................................................................37

*United States v. Williams*,
  65 F.3d 301 (2d Cir. 1995)......................................................................................23

*United States v. Yabe*,
  18 CR 726 (D.N.J. May 22, 2019) ECF No. 14.......................................................46

*United States v. Yagami*,
  14 CR 272 ECF Nos. 276, 282 (S.D.N.Y. Feb. 21, 2017 and March 13, 2017)....................46

*Williams v. New York*,
  337 U.S. 241 (1949)................................................................................................29

**Statutes**

18 U.S.C. § 1001.............................................................................18, 22, 26, 28

18 U.S.C. § 1505............................................................................................26

18 U.S.C. § 3553(a) ................................................................................ *passim*

**TABLE OF AUTHORITIES**
**(continued)**

Page

28 U.S.C. § 994(j)............................................................................................45

**Other Authorities**

*Lauri Love Case: US Abandons Extradition Case,* BBC News, Feb. 19, 2018
  *available at* https://www.bbc.com/news/uk-england-suffolk-
  43119355#targetText=A%20Crown%20Prosecution%20Service%20spokesm
  an%20confirmed%20Mr%20Love%20will%20not%20be%20extradited.&tar
  getText=Mr%20Love%20is%20waiting%20to,attacks%20in%202012%20and
  %202013 ..........................................................................................................34

Anthony M. Kennedy, Associate Justice, Supreme Court of the United States,
  Address at the ABA Annual Meeting (Aug. 9, 2003)
  https://www.supremecourt.gov/publicinfo/speeches/viewspeech/sp_08-09-03 ......................45

U.S. Sentencing Commission, *2018 Annual Report and Sourcebook of Federal
  Sentencing Statistics* at Table 30, available at
  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-
  reports-and-sourcebooks/2018/Table30.pdf ....................................................47, 48

# TABLE OF EXHIBITS

**EXHIBITS**

Letter of Samuel Cohen .................................................................... Exhibit A

Letter of Harriet Cohen ................................................................... Exhibit B

Letter of Philip Cohen ..................................................................... Exhibit C

Letter of Ara Cohen ......................................................................... Exhibit D

Letter of Antonio Batista ................................................................ Exhibit E

Letter of Dean Samuels .................................................................. Exhibit F

Letter of David Gillerman ............................................................... Exhibit G

Letter of Daniel Manor ................................................................... Exhibit H

Letter of Jake Ulrich ....................................................................... Exhibit I

Letter of Allison Gregory ................................................................ Exhibit J

Letter of Lisa Thompson ................................................................. Exhibit K

Letter of Rabbi Thomas Salamon .................................................. Exhibit L

Letter of Adam Victor ..................................................................... Exhibit M

Letter of Matthew Clarke ................................................................ Exhibit N

Letter of David Gregory .................................................................. Exhibit O

Letter of Simon Leech .................................................................... Exhibit P

Letter of Roxana Roman ................................................................. Exhibit Q

Letter of Jeffrey Auld ..................................................................... Exhibit R

Letter of Hume Steyer .................................................................... Exhibit S

Letter of Edward Glover ................................................................. Exhibit T

Letter of Michael Green .................................................................. Exhibit U

Letter of Melissa Clarke ................................................................. Exhibit V

Letter of Ian Burn ........................................................................... Exhibit W

Letter of Gerard Keneally ............................................................... Exhibit X

Letter of James Johnson ................................................................. Exhibit Y

# <u>INTRODUCTION</u>

This memorandum is submitted on behalf of defendant Michael L. Cohen, who is scheduled to be sentenced by the Court on November 19, 2019.  We respectfully submit that, in light of the nature of the offense, Mr. Cohen's otherwise responsible and positive life, and the substantial personal and professional consequences he has already suffered as a result of his conduct, a sentence of probation – which is within the advisory guideline range of 0 to 6 months – is sufficient to appropriately punish Mr. Cohen while permitting him to continue to maintain his strong family relationships and make a positive contribution to his community.

Several significant mitigating factors weigh in favor of a probationary sentence for Mr. Cohen.  First, Mr. Cohen's offense, making false statements to federal agents in his May 2013 interview, while serious, was mitigated by the fact that he corrected his misstatements just days later.  The interview concluded on a Thursday evening and Mr. Cohen almost immediately recognized the significant mistake he had made.  Mr. Cohen contacted his lawyer the very next day (Friday) to indicate that he wished to correct his answers.  His counsel provided the corrected information to the government on Monday.  While not excusing his conduct, the circumstances of his offense and his subsequent correction were such that the government's investigation was not ultimately impeded to any significant degree.

Mr. Cohen's personal background and character similarly indicate that probation is an appropriate sentence in this case.  Mr. Cohen is a 48-year-old father of three who has never before been in trouble with the law and who has an otherwise admirable record of hard work, devotion to family and friends, and charitable efforts.  When viewed in context, the offense that brings Mr. Cohen before the Court stands in stark contrast to his otherwise positive and responsible life.  Raised in a middle-class family in rural, small-town Maine, Mr. Cohen was, prior to this case, a self-made success story: he worked his way through college, eventually

joining a small, then-unknown financial firm as one of its first employees and through a combination of hard work and smarts, reached the top of his profession in the finance industry. At the same time, he was a devoted father, who preserved time for his family by getting to his desk at 6:00 am each morning and frequently skipping business dinners and after-work events in order to be home for family dinner each night. Mr. Cohen was also a loyal and steadfast friend to many others, always helping in their time of need, whether they had a family crisis, a professional setback, a medical emergency or money problems. Mr. Cohen's strong Jewish faith, which plays a central part in his life and has helped see him through difficult times, has led him to generously contribute his time and financial support to his synagogue and other charitable causes. As the numerous letters to the Court in support of Mr. Cohen demonstrate, in any balancing of the equities, he has much on the positive side of the ledger.

Finally, even if Mr. Cohen were to receive a probationary sentence, he has still suffered significant personal, professional and financial punishment as a result of his conduct that will serve as a substantial deterrent to both him personally and anyone else tempted to mislead federal prosecutors. As a result of his conviction and the publicity from the government investigation, his ability to work in the asset management industry – the one in which he's spent his entire career – is effectively over, since he is extremely unlikely to ever be approved by regulators to serve as an investment adviser or hired by an investment firm. In addition to the professional consequences, Mr. Cohen's personal reputation is in tatters as a result of the investigation and his conviction. He is the subject of numerous media stories that will follow him the rest of his life every time someone googles him. Many of his former friends and business colleagues now shun him. Banks and credit card companies have closed his accounts and refused his business. Even charities that Mr. Cohen volunteered to assist have rebuffed his

2

offers of help due to his conviction.  The investigation and his conviction have also taken a severe personal toll on Mr. Cohen, and most distressing to him, his family.  The stress, embarrassment and uncertainty of the criminal investigation have hung over Mr. Cohen's life and that of his family for seven years and sadly contributed to the decline of his marriage.  His children have been exposed to negative articles in the press about their father and have been bullied in school as a result of the investigation, including being taunted that their father is a "crook."

Each of these factors have been repeatedly recognized by courts as mitigating factors at sentencing.  We respectfully submit that, weighing Mr. Cohen's conduct against his entire life, a probationary sentence would be "sufficient, but not greater than necessary," to further the purposes of sentencing.  *See* 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

1.   **Personal History**

   A.   Mr. Cohen's Small-Town, Middle-Class Roots

Mr. Cohen was born and raised in a middle-class family in Waldoboro, Maine, a small rural town of several thousand residents where the main industries were fishing and farming. The nearest movie theatre was 20 miles away.  Both of Mr. Cohen's parents traced their roots in Waldoboro back several generations.  Mr. Cohen's father, Samuel Cohen, a U.S. Air Force veteran, had a general law practice in town, handling everything from real estate closings and drafting wills to trying murder cases.  Now 79, Samuel Cohen still practices law part-time. While Mr. Cohen was growing up, his mother, Harriet (known as "Bobbie") Cohen, now 72, worked as the office manager in her husband's law office for many years, as well as looking after Mr. Cohen and his older brother Philip Cohen.  The family lived in an old farmhouse where Mr. Cohen grew up surrounded by hens and horses.

Mr. Cohen's parents did their best to pass down to their sons their strong values, emphasizing hard work, education and religious faith. S. Cohen Letter (Ex. A) at 1. From a young age, Mr. Cohen's parents instilled in him a strong work ethic. Growing up, if Mr. Cohen wanted spending money or gas money, he had to work to earn it. If he wanted to buy something like a new bike or toy, his parents would agree to pay for half of it, but he would have to earn money to pay for the other half. As a result, as Bobbie Cohen recalled in her letter to the Court, "it is hard for me to remember a time when Michael wasn't working." H. Cohen Letter (Ex. B) at 1. From the age of 7, Mr. Cohen and his brother raised chickens on their property and sold the eggs to local residents to earn spending money. H. Cohen Letter (Ex. B) at 1; S. Cohen Letter (Ex. A) at 1; P. Cohen Letter (Ex. C) at 1. At other times, Mr. Cohen and his brother mowed lawns or collected bottles to return them for the nickel deposit. P. Cohen Letter (Ex. C) at 1. In the 7th through 10th grades, Mr. Cohen worked for a company setting up mobile homes. H. Cohen Letter (Ex. B) at 1. During the summers in high school, he worked as a crewman on a lobster boat six days per week, getting up and out of the house every morning at 4:30 a.m. and driving 50 miles to work. H. Cohen Letter (Ex. B) at 1; P. Cohen Letter (Ex. C) at 1-2. He also worked at times with his grandfather, who was a land surveyor, and did odd jobs for a neighborhood family. At home, his parents required that his chores were completed before Mr. Cohen could go out with his friends; for example, on winter Saturdays, he and his brother could not go anywhere until they had gathered all the fire wood the family needed.

Mr. Cohen's parents emphasized the importance of education. Mr. Cohen attended the local elementary public school, where there were about 25 students in his class. After that, he had to travel many miles to a regional high school with about 125 children per class. In his senior class, only a handful of students went to college. Mr. Cohen's parents expected him to

earn straight A's in school; if he did not, he was not allowed to watch television. Mr. Cohen excelled in school and graduated second in his high school class. Presentence Investigation Report ("PSR") ¶ 52. When not studying or working, Mr. Cohen played baseball, basketball and soccer. In high school, he became the captain of the basketball team and was selected as an "All-State" student-athlete in his senior year.

Growing up, Mr. Cohen's life was shaped by his family's strong Jewish faith. H. Cohen Letter (Ex. B) at 3; S. Cohen Letter (Ex. A) at 2. As a child and young man, he attended religious services regularly. As an adult and parent himself now, his faith remains central to his life and has been a source of strength and support for him in the difficult times of his life, including the investigation and prosecution of this case and his current divorce. As discussed in more detail below, he is an active member and former trustee of his synagogue in London. In Waldoboro, Mr. Cohen's family was one of the only Jewish families in town and at times experienced anti-semitism. Mr. Cohen and his brother were taunted with anti-semitic slurs in school. PSR ¶ 42; H. Cohen Letter (Ex. B) at 2. At one point in Mr. Cohen's childhood, his father's law office was repeatedly vandalized with spray-painted swastikas and his family received crank telephone calls at home, placing the whole family in fear. PSR ¶ 42; H. Cohen Letter (Ex. B) at 2. Eventually, the perpetrator, the ex-husband of a woman whom Samuel Cohen had represented in her divorce proceedings, was arrested.

After high school, Mr. Cohen won several scholarships to assist him in attending Bowdoin College in Maine. To pay his expenses while at college, he worked in the kitchen of his fraternity, washing dishes and eventually managing the whole kitchen staff in his senior year. A. Cohen Letter (Ex. D) at 1. After taking an economics course in his freshman year, Mr. Cohen decided to major in economics and pursue a career in the finance industry. He graduated *magna*

*cum laude* from Bowdoin in 1993 and was a member of Phi Beta Kappa.  PSR ¶ 53; H. Cohen Letter (Ex. B) at 2; S. Cohen Letter (Ex. A) at 2.

       B.      <u>Mr. Cohen's Successful Professional Career</u>

       Following his college graduation, Mr. Cohen obtained a position as an investment banking analyst at Credit Suisse and moved to New York City to begin his career.  PSR ¶ 57.  He took the $2,000 signing bonus he had been given by Credit Suisse and used part of it to buy three suits in brown, green and grey at a men's clothing store in Portland, Maine, only to realize once he arrived in New York that the suits did not project the professional look expected in sophisticated Manhattan.  As a result, he had to use his first paycheck to buy all new work clothes.  H. Cohen Letter (Ex. B) at 2.  Like many young people moving to New York to start their careers, Mr. Cohen lived with two roommates who were Bowdoin College friends in order to save money.  PSR ¶ 44; A. Cohen Letter (Ex. D) at 1.  Exhibiting the same work ethic that he had shown from an early age, Mr. Cohen worked 15 to 20 hours per day, seven days per week, analyzing mergers and acquisitions for financial institution clients.  PSR ¶ 57; A. Cohen Letter (Ex. D) at 1.

       In 1995, after two years at Credit Suisse, Mr. Cohen moved to a position as an analyst of banking stocks at a mutual fund called Mutual Shares (later called Franklin Mutual).  PSR ¶ 56.  His job there was to research banks and analyze whether Mutual Shares should buy their stock in its funds.

       In 1997, Mr. Cohen got the opportunity to join a start-up, then-unknown asset management firm named Och-Ziff Capital Management in New York.  PSR ¶ 55.  When he joined as a research analyst, he was just the fifth employee of the firm.  Mr. Cohen's job was to research companies at a fundamental level to determine whether the firm should buy their stock

for its funds.  Mr. Cohen excelled in this position and the firm began to attract even more

investors.  In 1999, Och-Ziff determined that it needed to establish a European office, and since

Mr. Cohen had some experience analyzing European stocks from his prior job, he was asked to

move to London and start up the office there.  PSR ¶ 55.  The London office was originally just

Mr. Cohen alone researching potential investments in European companies; by the time he left

the firm in 2013, he had built the London office to 65 employees and Mr. Cohen and his team

were responsible for managing $12 to $13 billion of investors' assets.  They consistently earned

significant returns for clients, creating hundreds of millions of dollars of gains for investors,

which were largely charitable institutions, pension funds, university endowments, and other

institutional investors.  Mr. Cohen became one of the most respected asset managers in Europe

and was frequently asked to speak at industry conferences.  *See* A. Batista Letter (Ex. E) at 2.

Several of Mr. Cohen's colleagues have described how he led the office by example,

arriving at his desk each morning at 6:00 am, sitting at a desk with his team on the trading floor

instead of a corner office, and treating everyone from the partners to the cleaning staff with

respect and fairness.  A. Batista Letter (Ex. E) at 1 ("Michael led the office by example in a

highly dedicated, hardworking and disciplined way.  Unlike most senior executives who sit in

corner offices, Michael chose to sit in the middle of the floor to be side-by-side with his team.

His constant accessibility helped create a culture of collaboration and transparency.  Everyone

looked up to him and was inspired by his professionalism and work ethic….Michael was

respectful and fair to all employees, be they investment professionals, operational staff or

assistants who in return were very loyal and stayed on for years."); D. Samuels Letter (Ex. F) at

1 (worked alongside Michael for 10 years, and "throughout his time, I watched Michael treat

everyone with the utmost respect.  I have always found him to be incredibly professional and fair

in his dealings with me, and the same in observing his interactions with all employees, from the office cleaning staff to the partners. I admired not just his professionalism but also his generosity with his time and desire to make a difference."); D. Gillerman Letter (Ex. G) at 1 (reported directly to Michael, whom he came to "immensely respect"); D. Manor Letter (Ex. H) at 1 (for six years, worked closely with Michael, who "led the office and the team, setting elevated work and ethical standards"); J. Ulrich Letter (Ex. I) at 1 (for three years, reported to Michael, who was "an excellent supervisor and role model. He worked hard and led by example.").

Mr. Cohen served as a mentor to his employees, and took an interest in their careers and families. A. Batista Letter (Ex. E) at 2 (Michael was "someone who takes mentoring and the careers of his co-workers seriously," noting that "I feel extremely privileged to have worked with and learned from Michael and he has played a major role in getting me to where I am now"); D. Gillerman Letter (Ex. G) at 1 ("I have learnt a lot from Michael" while working together and "am grateful for the opportunity to have worked with him."); D. Manor Letter (Ex. H) at 1 (Michael was "a great mentor," who "set the foundations" for Manor's later career); J. Ulrich Letter (Ex. I) at 1 (Michael "took mentoring and the careers of colleagues very seriously;" he was "a wonderful colleague and mentor and I am honored to count him as a true friend").

Having personally experienced the sting of discrimination as a result of his Jewish faith and his inter-racial marriage, Mr. Cohen felt an obligation to hire women and diverse employees and assure a workplace that treated everyone equally. In fact, Mr. Cohen hired the first woman investment professional ever at Och-Ziff. A. Batista Letter (Ex. E) at 2. ("Michael also had a strong commitment to diversity. In an industry that lacks diversity, Michael was committed to having a diverse office."); D. Samuels Letter (Ex. F) at 1 ("Michael also had a particular will to improve our efforts with regard to staff well-being initiatives and equality issues.").

As a result of his professional success, Mr. Cohen became wealthy. Although this allowed his family to enjoy a lifestyle far different than the one Mr. Cohen knew as a child, he has never forgotten his middle-class roots. His family, friends and co-workers uniformly attest that he remains a modest and understated man. A. Gregory Letter (Ex. J) at 1 (despite his professional success, Michael "has no arrogance or pretensions and treats people straightforwardly as he finds them"); P. Cohen Letter (Ex. C) at 2 ("the people who know my brother best are the people who grew up with him. And they know Michael may live somewhere else now, he may live a different life-style, he may move in different circles, but his character has not changed, and those who know him best know that no matter how long he has been gone he never left them"); L. Thompson Letter (Ex. K) at 2 (Michael is "a tremendously modest and down to earth person"); A. Batista Letter (Ex. E) at 2 ("I have appreciated Michael's modesty and understatement of his personal success….I don't remember a single time hearing him vaunt or even mention his personal wealth or indeed any derivative thereof, be it cars, houses or other luxury items"); T. Salamon Letter (Ex. L) at 2 (noting Michael's "good character," and observing that "in spite of his acumen and abilities, I found him modest and approachable").

C.    Mr. Cohen's Devotion to Family and Friends

Mr. Cohen has always strived to balance his career with his family life. A. Cohen Letter (Ex. D) at 1 (Michael always "exhibit[ed] hard work, dedication and drive all while being incredibly family oriented and community minded"). Mr. Cohen started dating his future wife, Marisol, in New York City in 1998. When he moved to London in 1999, she moved with him and they eventually married, first in a civil ceremony in London in December 1999 and then a more formal ceremony with their families in Washington, D.C. in May 2000. PSR ¶ 45. Marisol, who is originally from the U.S. Virgin Islands, is African-American and when she and

Mr. Cohen moved to London, they were often the target of racial slurs and other forms of discrimination.  H. Cohen Letter (Ex. B) at 3.

Mr. Cohen and his wife have three children, who are the focus of his life: their daughter, O.C.[1] (age 18), their son, M.C. (age 16) and their daughter, H.C. (who will turn 13 this week).  PSR ¶ 45; H. Cohen Letter (Ex. B) at 3 (children are "the light of his life"); S. Cohen Letter (Ex. A) at 2 (Michael is "a dedicated and very devoted father," who "loves [his children] deeply and is always there for them").  Even when he had a demanding career and enormous professional responsibilities, Mr. Cohen was a devoted and hands-on father.  He structured his work schedule to get into the office by 6:00 am each morning and ate lunch at his desk so he could be home for dinner with his family, and saved weekends for family time.  He declined work dinners and after-hours business events to spend time with his children.  A family friend, Adam Victor, observed that "anyone who knows Michael will tell you [that] the most important thing to him [is] his family."  Mr. Victor describes Mr. Cohen as "one of the most devoted fathers you would ever see.  Family first no exceptions.  He has spent days at end watching his kids play sports, morning school runs, family vacations…both Mike and Marisol systematically have put their three beautiful and amazing children first."  A. Victor Letter (Ex. M) at 1-2.  Mr. Victor noted that, unlike others in the high-powered finance industry, Mr. Cohen was "the person I have met in Wall Street that always put family first," adding that "Mike never agreed to client events or fun dinners, even valuable work events we had – it was family dinner every night."  *Id*.  Another long-time friend, Mathew Clarke, described Mr. Cohen as "one of the most hands-on, dedicated fathers I have ever seen.  He attends countless school events, team practices and swim meets –

---

[1]  Pursuant to Fed. R. Crim. P. 49.1 and this district's Administrative Order 2004-09, Mr. Cohen's minor children are referred to by their initials.

spending nearly every afternoon and entire weekends traveling all over the country to support his children. He is ever present as a father and a true role model." Matthew Clarke Letter (Ex. N) at 1. *See* D. Gregory Letter (Ex. O) at 1 ("Despite his career responsibilities, and in contrast to many of his peers, Michael scheduled his life – principally by setting the alarm for 4:30 am – so that he could also participate fully in his children's school life, watching their plays, witnessing their sporting achievements, and attending their teacher meetings"); L. Thompson Letter (Ex. K) at 1 ("Michael's devotion to the children is incomparable….He has declined to attend many social events in order to be with his children at competitions around the country").

Another friend, Simon Leech, noted:

> Without a doubt, Michael is one of the most caring and devoted fathers I know. He is hands-on and participates in everything with the children. From packing school lunches, pickups, drop-offs, rehearsals, sports, competitions, homework, school events, and everything in between, Michael is always there to support the children despite his hectic schedule. His weekends are filled with early morning swim meets for [M.C.] (so early that it is still dark outside), horse training with [O.C.], and tennis with [H.C.]. He is always bouncing back and forth. Nearly everything Michael does, he does with his family. He is truly the most incredible dad.

S. Leech Letter (Ex. P) at 1.

Mr. Cohen's oldest daughter, O.C., is a freshman at the University of Chicago, and is passionate about horseback riding. When O.C. was in school in London, Mr. Cohen frequently traveled all over the English countryside with her, both on weekends and mid-week, to riding competitions to encourage her. A. Gregory Letter (Ex. J) at 1; S. Leech Letter (Ex. P) at 1; A. Victor Letter (Ex. M) at 1. Mr. Cohen was active in raising money for O.C.'s school in London, and donated funds to endow a scholarship that would allow underprivileged girls to attend the school. █████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████ The investigation and his conviction, and the recent divorce proceedings, have unfortunately strained Mr. Cohen's relationship with O.C.  O.C. used to look up to her father as someone to emulate; one of the most painful things for Mr. Cohen about his current situation is the loss of stature in his daughter's eyes and the knowledge that he has let his family down.

Mr. Cohen's son, M.C., is in 10th grade and is a nationally-ranked swimmer who hopes to qualify for the British Olympic swimming team.  M.C.'s swim coach and many of Mr. Cohen's friends have noted in their letters to the Court how demanding it is for parents of top competitive swimmers.  There are lengthy, early morning practices and every weekend is filled with travel to competitions in England (outside of London) or elsewhere in Europe.  R. Roman Letter (Ex. Q) at 1; J. Auld Letter (Ex. R) at 1-2.  Despite this, Mr. Cohen is a constant presence at M.C.'s practices and swim meets.  L. Thompson Letter (Ex. K) at 2 (Michael "is the one taking [M.C.] to the pool at 5 in the morning for swim practice and cheering him on during his competitions. Michael would never ask anyone else to do this, even though he has the means to do so"); A. Gregory Letter (Ex. J) at 1 (M.C.'s swimming has "involved Michael in countless dawn runs to school" to drop him at practices and "weekend competitions where Michael spends 2 days in a chlorine-filled pool building waiting for [M.C.'s] 2 or 3 races"); J. Auld Letter (Ex. R) at 2 (describing Michael's hours at the pool and long drives to support [M.C.'s] swimming and noting that it is "a real testament to Michael's character that he is prepared to give up so much time in support of his children"); H. Cohen Letter (Ex. B) at 3 ("Win or lose, Michael is always there to support [M.C.] every step of the way").

M.C.'s swim coach, Roxana Roman, describes the strong bond between M.C. and his father:

> The bond between Michael and [M.C.] is unique and stronger than most I have seen. When [M.C.] has a success or failure, the person he wants to share it with first and foremost is his father. Michael is a constant part of [M.C.'s] emotional and personal development. This is never clearer than in those moments when [M.C.] has failed in an endeavor and Michael has provided unconditional, unadulterated and unequivocal support. The most heartfelt sentiment I can offer is that watching Michael be a father to his children makes me wish my own father had offered me even half of the support and care that Michael provides to his children.

R. Roman Letter (Ex. Q) at 1.

Mr. Cohen's youngest child, H.C., is in 7th grade. Like her brother and older sister, she is a dedicated athlete, playing tennis at a high level, and Mr. Cohen is a constant presence in her life. ███████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████

In addition to his devotion to his children, Mr. Cohen has also been a reliable and steadfast friend to others. One friend, Adam Victor, opened his letter to the Court by asking: "How does one start to talk about someone who has become so important in your life? Someone

who you know has been there for you, supported you, made your life fuller and more promising?" A. Victor Letter (Ex. M) at 1. Mr. Victor described how Mr. Cohen had helped him through a difficult time in his personal life, and how Mr. Cohen "was there for me the whole way, and I don't know how I could have survived those two years without him….[H]e would call me, console me, guide me. He became my rock that I could confide in and count on." A. Victor Letter (Ex. M) at 2.

Another friend, Simon Leech, observed that Mr. Cohen "has one of the biggest hearts I have ever seen," and knows him as "a good person who is completely devoted to his family and friends – a kind, generous, loyal, honest and loving person who I am honored to call my friend." S. Leech Letter (Ex. P) at 2. Mr. Leech noted that he and Mr. Cohen are "the unlikeliest of friends," since they come from "different backgrounds, different countries and different industries" and "did not travel in the same circles," yet struck up a conversation by chance one day and have become such close friends that Mr. Leech considers himself like a "godfather" to Mr. Cohen's youngest daughter, H.C. S. Leech Letter (Ex. P) at 1, 2. Mr. Leech described Mr. Cohen as "one of the few people in life you can always count on during difficult times, whatever the circumstances," and recounted the time that Mr. Cohen offered to pay his employees to save his fledgling company:

> A few years ago, I started a technology company. Like any new startup, there were challenges getting it off the ground and running. At one point, I mentioned to Michael that I wasn't going to be able to make the payroll to pay the employees that week. I was confiding in him as a friend and although I never asked Michael for help, he did not want me to let my employees down and immediately said to me, "Simon, I will transfer whatever you need right now." With Michael's help, I was able to meet my payroll. I will never forget this act of kindness and generosity and what it meant to my company and me.

S. Leech Letter (Ex. P) at 2.

14

Another friend, Matthew Clarke, offered a similar story, describing Mr. Cohen as "a friend who will be there through it all no matter what. Through good times and bad, Michael is always there to offer help, perspective and advice. He has shown extraordinary kindness and generosity throughout our friendship." Matthew Clarke Letter (Ex. N) at 1. Mr. Clarke recalled times when he was experiencing financial difficulties:

> [Michael] was never too busy to listen and was a shoulder for me to lean on during these difficult times. Each time, and without hesitation, Michael was there to provide me with support and whatever assistance I needed – he didn't ask questions, he never pressured me to pay him back, his response was simply to let me know he was there to help me. He has shown the same generosity with others as well.

Matthew Clarke Letter (Ex. N) at 1.

In his letter to the Court, a former work colleague, Dean Samuels, recounted an incident where his wife became seriously ill for several months and Mr. Cohen "offered any assistance within his power to give, as well as regularly going out of his way to visit us and provide support." D. Samuels Letter (Ex. F) at 1. Mr. Samuels noted that "Michael went above and beyond what could be expected from a boss, but also a friend." *Id*. A family friend, Lisa Thompson, called Mr. Cohen "the most kind, reliable and wonderful guy, and a loyal friend." L. Thompson Letter (Ex. K) at 2. Ms. Thompson described how Mr. Cohen takes time to check in on her elderly parents whenever he is in the area where they live, saying "That is what Michael is like – a down to earth, solid, wonderful father and friend." *Id*. *See* A. Gregory Letter (Ex. J) at 1 ("Michael is a man who I feel I could call upon at any time to help me or my children"); A. Cohen Letter (Ex. D) at 2 (Michael "has always been a friend available for support and guidance").

<u>Mr. Cohen's Devotion to His Synagogue and Other Charitable Pursuits</u>

Mr. Cohen and his family have been active and committed members of the Westminster Synagogue in London for many years.  Mr. Cohen has worked with each of his children to prepare for their bar/bat mitzvahs, with his youngest daughter H.C.'s bat mitzvah scheduled for January 2020.  T. Salamon Letter (Ex. L) at 2; H. Cohen Letter (Ex. B) at 3.  Rabbi Thomas Salamon, the former leader of Mr. Cohen's congregation in London, described how Mr. Cohen simply presented himself one day years ago, asking the rabbi if there was some work he could do to support the synagogue.  T. Salamon Letter (Ex. L) at 1.  Mr. Cohen eventually became a Trustee of the synagogue.  During this time, Mr. Cohen "gave of his time freely," and "no task was too big or too small," yet he did all this "not expecting any thanks or gratitude."  T. Salamon Letter (Ex. L) at 2; E. Glover Letter (Ex. T) at 1 ("Michael has never shied away from a project, no matter how big or small, and his contributions have been invaluable").  One of the outreach programs of his synagogue that Mr. Cohen was involved with was called the "Peace of Mind" program, which sought to provide "emotional and psychological support for Israeli veterans transitioning back into civilian life."  M. Green Letter (Ex. U) at 1.  As part of this program, Israeli soldiers leaving the military were matched with families with whom they could live temporarily to assist in their reintegration into civilian life.  Michael Green, a friend and fellow member of the synagogue, noted that "When Michael introduced me to the project, I was so moved by his passion for Peace of Mind that I agreed to volunteer my home to host two soldiers."  *Id*.  At a certain point after the government investigation began, in order to avoid causing negative publicity for the synagogue, Mr. Cohen sought to step down as a Trustee.  Even in the face of potential reputational damage to the congregation, his fellow members "were reluctant to agree to his request as we valued his contribution to Synagogue affairs and saw no

reason to distance ourselves from him." E. Glover Letter (Ex. T) at 1. In the interests of the synagogue, Mr. Cohen stepped down, but nonetheless continued his work with the congregation, just without the title. E. Glover Letter (Ex. T) at 1; T. Salamon Letter (Ex. L) at 2.

As the letters to the Court attest, Mr. Cohen has also been generous with his time and financial support to other charitable endeavors. When Mr. Cohen learned that his wife's niece wanted to attend his alma mater, Bowdoin College, but was unable to afford the full tuition, he agreed to pay whatever she needed to attend the college. H. Cohen Letter (Ex. B) at 4. When Mr. Cohen's sister-in-law's father was diagnosed with leukemia, and she was trying to raise money to pay for his medical expenses, he took it upon himself to provide her family with financial assistance. S. Cohen Letter (Ex. A) at 2. As previously noted, Mr. Cohen established a scholarship at his oldest daughter's school for young girls who could not otherwise afford to attend the school and endowed a foundation in his youngest daughter's name at Boston Children's Hospital to support medical research into treating children with disfiguring birth defects or injuries. H. Cohen Letter (Ex. B) at 3; H. Steyer Letter (Ex. S) at 1-2. He has donated funds to upgrade the facilities at the swimming pool at his son's school. R. Roman Letter (Ex. Q) at 1. When his friend Simon Leech's start-up company was at risk of failing because it could not meet its payroll, Mr. Cohen volunteered to pay the company's employees, saving their jobs. S. Leech Letter (Ex. P) at 2. When Mr. Cohen learned that a friend was in danger of losing his job, he intervened with the friend's boss to save his job. S. Leech Letter (Ex. P) at 2. Even though he was not a church member, Mr. Cohen supported his family friends' efforts to raise money for their local church, both financially and by traveling several hours from London to attend the church's "Charity Day." I. Burn Letter (Ex. W) at 1. When Mr. Cohen learned that his brother's daughter was visiting London on a school trip, he bought theatre tickets for her

entire class. H. Cohen Letter (Ex. B) at 4. In addition, Mr. Cohen has recently begun volunteering his time one day per week at a London hospital, Chelsea and Westminster Hospital, where his work includes interacting with patients in a variety of ways, including escorting them to x-rays or other tests, pushing their wheelchairs, and simply befriending them and giving them someone to talk to if they seem lonely. *See* Matthew Clarke Letter (Ex. N) at 2 (Michael "has remained committed to his charitable work and to helping others. He gives quietly and unselfishly with no expectation of receiving anything in return").

## 2.    **The Nature of the Offense**

Mr. Cohen pleaded guilty to a single count of making false statements in violation of 18 U.S.C. § 1001 in connection with a May 30, 2013 interview with federal agents and DOJ and SEC attorneys. In that interview, Mr. Cohen was asked about a letter dated October 14, 2010, and made false statements about the timing of the letter's creation and his receipt of the letter.

The SEC and DOJ investigation that led to this interview began in 2011 and was primarily focused on whether asset management firms had potentially violated the Foreign Corrupt Practices Act ("FCPA") in obtaining investments from foreign sovereign wealth funds. Since Mr. Cohen's firm, Och-Ziff, had employed an agent (the "London Businessman") in connection with a previous investment in its funds by a foreign sovereign wealth fund, the relationship between Och-Ziff employees and the London Businessman became one of the subjects of the investigation.

In December 2008, Mr. Cohen had agreed to extend a significant loan to the London Businessman, who had substantial assets but who needed cash in order to make scheduled payments on a boat that he was purchasing. That loan, although originally intended to be only short-term, was still outstanding in late 2010 when an Och-Ziff-affiliated fund that Mr. Cohen oversaw, African Global Capital II ("AGC II"), began exploring the purchase of shares in a

private U.K. company named Strata Limited. An AGC II employee had been approached by a Strata shareholder offering to sell his shares, and the fund eventually explored the possibility of purchasing shares from other Strata shareholders as well in order to amass a greater stake in the company. Since the London Businessman coincidentally also owned Strata shares, AGC II approached him, and he was willing to sell his Strata shares at the same price as the original shareholder (which was approximately 47% below the shares' market value.)[2]

In order to avoid the potential conflict of interest, Mr. Cohen asked the London Businessman to agree that he would not repay the loan from Mr. Cohen using the proceeds from the sale of his Strata shares. The London Businessman orally agreed that he would not do so and indicated that he would re-pay the loan from the anticipated sale of shares he held in another company, Ncondezi Coal Co. Ltd. ("Ncondezi"), which were subject to a lock-up expiring in mid-December 2010. On December 15, 2010, as they had discussed, the London Businessman sold shares in Ncondezi, generating proceeds of approximately $5.4 million, but, in violation of his promise to Mr. Cohen, used the proceeds to pay off another loan. On December 29, 2010, AGC II's purchase of Strata shares from the London Businessman and another shareholder closed and the London Businessman received approximately $9.3 million. Contrary to his agreement with Mr. Cohen and unbeknownst to Mr. Cohen, the London Businessman used $4 million of the sale proceeds to make a partial loan repayment to Mr. Cohen.

In early 2012, by which time the SEC investigation had begun, Mr. Cohen had a conversation with the London Businessman in which he assured Mr. Cohen that he and Och-Ziff

---

[2] Also indicating that the Strata purchase price was a fair one for AGC II is the fact that, approximately six months later, the London Businessman sold more of his Strata shares at the same price in an arms-length transaction with another party who was a sophisticated investor and who had detailed knowledge of Strata's business because he was an existing shareholder of the company.

had done nothing wrong. The London Businessman told Mr. Cohen that he believed he had not used any of the sale proceeds from the Strata transaction to repay Mr. Cohen. As bank records subsequently produced by the government in discovery show, this was untrue. The London Businessman said he would check his records and if this was correct, he would write Mr. Cohen a letter to this effect. Shortly thereafter, in March 2012, the London Businessman provided Mr. Cohen with a letter addressed to him dated October 14, 2010, which purported to be a contemporaneous agreement by the London Businessman not to repay the loan from Mr. Cohen from the Strata proceeds. Mr. Cohen had not requested that the London Businessman backdate the letter but he nonetheless accepted it.

The letter was responsive to subpoenas the SEC served on Och-Ziff and Mr. Cohen in 2012, so, even though he knew the date on the letter was wrong, Mr. Cohen provided a copy of the letter to an Och-Ziff lawyer and produced the letter to the SEC. Mr. Cohen knew that the letter would create the false impression to government investigators that his agreement with the London Businessman had been documented in 2010.

Mr. Cohen agreed to a voluntary interview with DOJ and SEC attorneys and federal agents on April 4, 2013 at the U.S. Attorney's Office in Brooklyn. Mr. Cohen was accompanied by counsel. The interview lasted almost all day, and the government's questions largely related to its FCPA investigation. The Strata transaction was briefly discussed. Mr. Cohen explained that the London Businessman had agreed with him not to repay the loan to Mr. Cohen from the proceeds of the Strata transaction. Mr. Cohen made reference to the letter from the London Businessman but he was not shown the letter by the government, nor was he asked about the timing of its creation. However, as a practical matter, Mr. Cohen left the government with the impression that the letter had been provided to him around the time of the Strata transaction.

ny-1673615

During the interview, the government advised that it was in possession of bank records indicating that the London Businessman had received the proceeds of the Strata transaction on the same day as his repayment of the loan to Mr. Cohen. The government asked Mr. Cohen if he was surprised that this was the case and he answered that he was.

Mr. Cohen agreed to continue his voluntary interview with DOJ and SEC attorneys and FBI and IRS agents on May 30, 2013, also at the U.S. Attorney's Office in Brooklyn. A total of ten agents and lawyers attended on behalf of the government. Mr. Cohen was again accompanied by his attorneys. Just as with his first interview, this one lasted almost all day and the vast majority of the government's questions related to topics other than the Strata transaction. At one point during this interview, the government showed Mr. Cohen the letter from the London Businessman dated October 14, 2010, and asked him questions about it. The government's questioning suggested that it believed that the letter was backdated. Mr. Cohen stated, in substance, that the date on the letter was accurate and that he had received it in 2010. These statements were false. In fact, Mr. Cohen knew that the letter had been written in 2012, not in October 2010 as the date indicated. He also knew that he had received the letter in 2012, not 2010.

The interview, which took place on a Thursday, ended in the early evening. Mr. Cohen proceeded directly from the U.S. Attorney's Office to the airport for his overnight flight back home to London. The very next day, Friday, Mr. Cohen contacted his counsel and indicated that he wished to correct his answers regarding the letter. On Monday, June 3, 2013, Mr. Cohen's counsel contacted the SEC and DOJ attorneys and in a telephone call with them and an FBI agent, advised them that Mr. Cohen wanted to correct his misstatements. Mr. Cohen's attorney told the government attorneys that Mr. Cohen recognized that he should have given them correct answers

21

in the interview but since he had not done so, he wanted to make the correction as soon as possible.

Apparently based upon the corrected information provided by Mr. Cohen, the government obtained the computer metadata regarding the letter from the London Businessman over a year later, in September 2014. When it was produced, it corroborated Mr. Cohen's corrected statement that the letter had been created in March 2012.

In 2013, Och-Ziff advised Mr. Cohen that it believed that his loan to the London Businessman should have been disclosed to the primary AGC II investor (identified in the Indictment as the "Charitable Foundation") in connection with the Strata transaction. As a result, in June 2013, Mr. Cohen agreed to personally reimburse the Charitable Foundation (on behalf of Och-Ziff) approximately $8.73 million so that it would effectively be in the same position as if AGC II had never engaged in the Strata transaction.

## LEGAL ANALYSIS

### 1.    The Advisory Sentencing Guideline Range

The Probation Department found that Mr. Cohen is in Criminal History Category I and using § 2B1.1, determined a final offense level of 4, yielding an advisory sentencing guideline range of 0 to 6 months. PSR ¶¶ 33, 36, 63. Mr. Cohen agrees with this calculation.

The government's objections to the PSR's calculation (Gov't Letter dated Oct. 15, 2019 at 2) were correctly rejected by the Probation Department. October 23, 2019 Addendum to PSR at 3. The government's objection letter suggests that a different offense guideline should be used, relying upon § 1B1.2(a) and (c). *Id.* However, as the Probation Department found, this provision does not support a different result. Section 1B1.2(a) directs that the offense guideline specified in the Statutory Index "for the offense of conviction" be used. Consistent with the approach employed in the PSR, the Statutory Index indicates that for a violation of 18 U.S.C. §

1001 (the offense of conviction here), § 2B1.1 should be used, except in cases involving terrorism or sex offenses. The only exception to this rule discussed in either § 1B1.2(a) or (c) is where the plea agreement in the case contains a "stipulation that specifically establishes a more serious offense than the offense of conviction." This is inapplicable here, since there is no such stipulation in Mr. Cohen's plea agreement with the government. Indeed, in paragraph 2 of the plea agreement, where the government set out its position that the obstruction of justice guideline should apply and provides its estimate of the guideline range, the agreement specifically provides that Mr. Cohen "does not stipulate" to the government's calculation. Accordingly, the applicable advisory guideline range is 0 to 6 months, as set forth in the PSR.

## 2. The Court's Expansive Sentencing Discretion

As the Supreme Court has recognized, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). With the United States Sentencing Guidelines now rendered "advisory only," *Kimbrough v. United States*, 552 U.S. 85, 91 (2007), a district court has substantial discretion in fashioning a sentence appropriate to the individual circumstances of the defendant and the unique facts of the offense. As this Court has recently noted, a sentencing judge has the "responsibility under Supreme Court and Second Circuit precedent to determine an independently 'reasonable' sentence based on an 'individualized application of the statutory sentencing factors' in § 3553." *United States v. Johnson*, 16 CR 457 (NGG), 2018 WL1997975 at *4 (E.D.N.Y. April 27, 2018) (quoting *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010)).

The Second Circuit has long described the "traditional role of the district judge" as "bringing compassion and common sense to the sentencing process." *United States v. Williams*,

65 F.3d 301, 309-10 (2d Cir. 1995) (quoting *United States v. Rogers*, 972 F.2d 489, 495 (2d Cir. 1992)). Moreover, the Second Circuit has made clear that this "historic role" is to continue as district judges exercise their discretion, noting that "although the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006) (affirming non-guidelines sentence based in part on district judge's "gut feeling" about the defendant). In determining what sentence will be "sufficient, but not greater than necessary" to further the goals of section 3553(a), "a sentencing judge must have a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain.'" *United States v. Singh*, 877 F. 3d 107, 121 (2d Cir. 2017).

**3.** **Analysis of the Section 3553(a) Factors**

In exercising its sentencing discretion, a district court must impose a sentence "sufficient but not greater than necessary" to comply with the various purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). In determining an appropriate sentence for a defendant, § 3553(a) directs the Court to consider the following factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant;
>
> (3) the kinds of sentences available;
>
> (4) the applicable sentencing guideline range and Sentencing Commission policy statements;
>
> (5) the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct; and

(6)  the need to provide restitution to any victims of the offense.

*Id*.

Applying the factors set forth in § 3553(a), it is plain that any sentence involving incarceration for Mr. Cohen would be "greater than necessary" to accomplish the sentencing objectives of the statute.

A.    The Nature and Circumstances of the Offense

Pursuant to § 3553(a)(1), the Court must consider the "nature and circumstances of the offense" in crafting an appropriate sentence for the defendant.  While serious, the overall nature and circumstances of Mr. Cohen's offense suggest that anything other than a probationary sentence would be "greater than necessary" to accomplish the sentencing objectives of § 3553(a)(2).

First and foremost, Mr. Cohen corrected his false statement to the FBI within days of his interview back in 2013 and has accepted responsibility for his conduct.  As described above, Mr. Cohen contacted his counsel seeking to correct his misstatement the very next day (a Friday) after his interview.  On Monday, his counsel advised the government of the correct facts.  In doing so, Mr. Cohen conceded that he had made false statements.  Mr. Cohen made a serious mistake – one for which he will forever carry a criminal conviction – but he quickly recognized his error and sought to acknowledge it and take responsibility for it.

Moreover, given these circumstances, the government's investigation could not have been impeded to any significant degree, even if it ever believed Mr. Cohen's interview statements in the first place.  While Mr. Cohen accepts responsibility for his offense and recognizes that any material false statement to investigating agents is unacceptable, there is no indication that his conduct prevented the government from conducting a comprehensive investigation and obtaining all relevant facts.  *See United States v. Stewart*, 590 F.3d 93, 139 (2d

Cir. 2009) (where "no actual harm" resulted from defendant's conduct, it was "not unreasonable" for district court to find that this "mitigated the gravity" of the offense).

More specifically, courts – as well as the government – have recognized in similar cases that the absence of any actual interference with the government's ability to obtain the facts in an investigation is a mitigating factor justifying a potential variance. For example, in *United States v. Rafal*, 17 CR 10004 NMG (D. Mass.), the defendant was convicted of obstructing an SEC investigation in violation of 18 U.S.C. § 1505 for making false statements in SEC testimony in order to conceal illegal referral payments. In its sentencing memorandum advocating a non-jail sentence, the government noted that Rafal's false statements had the potential to keep the SEC from discovering these referral payments but "that potential was not fulfilled," and conceded that this fact "is relevant to determining the appropriate sentence." Gov't Sentencing Mem. at 2, 17 CR 10004 (NMG), (D. Mass. April 17, 2017) ECF No. 13. The government advised the Court that "Rafal's crime was serious, but because of the SEC's successful independent investigative work, it was not particularly consequential." *Id*. at 3. At sentencing, the Court granted a variance from the applicable guideline range of 10 to 16 months and imposed a non-jail sentence, specifically noting to Rafal that "for your sake and for the sake of the system, your obstruction was discovered." Sentencing Tr. at 10, *United States v. Rafal*, 17 CR 10004 (NMG) (D. Mass. April 20, 2017) ECF No. 19.

In *United States v. Santiago*, 13 CR 039 (CM) (S.D.N.Y.), the defendant, Santiago, was a United States Marine whose gun accidentally discharged, killing a fellow soldier. In a subsequent interview with military authorities investigating the shooting, Santiago denied knowledge of how the shooting occurred. Although he corrected his statement the same day, he was convicted in federal court of making a false statement under 18 U.S.C. § 1001. In

considering the § 3553(a) factors, Judge McMahon noted that Santiago's "lie neither misled the investigators, who did not believe it, nor impeded any investigation or proceeding; indeed, it caused no harm to anyone other than Santiago himself."  Sentencing Tr. at 8, *United States v. Santiago*, 13 CR 039 (CM) (S.D.N.Y. Oct. 9, 2014) ECF 114.  In weighing the seriousness of Santiago's offense, the Court noted that "a lie retracted within minutes, a lie that was never believed or relied on, while still a lie, is not much of a crime."  *Id*. at 11.  The Court further noted that the United States Attorney's Office had indicated, by its actions, that it also did not regard Santiago's offense as particularly serious because the government "regularly ignores far worse," citing the fact that prosecutors frequently presented at trial the testimony of cooperators who had previously falsely denied their crimes yet they had never charged such witnesses with making false statements or perjury.  *Id*. at 11.  The Court concluded that "I cannot be convinced that the government really believes that what Mr. Santiago did … qualifies as a particularly serious crime.  The punishment for this crime should, I believe, reflect the degree of seriousness with which the government has treated far greater and more serious and consequential lies over the 16 years that I have sat on this bench."  *Id*. at 13.  The Court ultimately sentenced Santiago to a fine only with no probation, since he was "not in need of any supervision," and a probationary period would only be "a waste of our overworked probation officers' time."  *Id*. at 23.

In *United States v. Schulte*, 10 CR 455 (WYD) (D. Colo.),  the defendant, Schulte, was an employee of a medical device company who made false statements in an interview with government agents during the execution of a search warrant at the company's office.  After having the opportunity to review his emails regarding the subjects of the interview, Schulte sent a letter to the government correcting his misstatements five days after his interview, as well as two other subsequent letters with corrections.  Order at 3, *United States v. Schulte*, 10 CR 455

(WYD) (D. Colo. May 14, 2012) ECF No. 279. At trial, the agent who questioned Schulte in the interview conceded that he knew the answers to the questions that Schulte answered falsely before he asked them. Sentencing Tr. at 19, *United States v. Schulte*, 10 CR 455 (WYD) (D. Colo. May 14, 2012) ECF No. 279, but Schulte was convicted of violating 18 U.S.C. § 1001. At sentencing, the Court imposed a sentence of one year probation and community service. *Id*. at 30-31.

In *United States v. Bonds*, 07 CR 732 (SI) (N.D. Cal.), the defendant, former Major League Baseball player Barry Bonds, was convicted of obstruction of justice in connection with his testimony before a grand jury investigating the use of steroids in sports. At sentencing, both the Probation Department and the Court found that a mitigating factor justifying a below-guidelines sentence was the fact that Bonds' false grand jury testimony had not actually resulted in interference with the government's investigation. The Court ruled that Bonds had "made an effort to obstruct justice, but that I also find that he didn't manage to succeed in that." Sentencing Tr. at 8, *United States v. Bonds*, 07 CR 732 (SI) (N.D. Cal. Dec. 27, 2011) ECF No. 425. The Court noted that, despite Bonds' efforts, the grand jury and the prosecutors successfully completed their investigation and had highlighted the issue of steroids in sports in the "national consciousness." *Id*. at 9. The Court ruled that, as a result, the obstruction of justice guidelines overstated the seriousness of Bonds' offense. *Id*. at 7-9. The Court ultimately sentenced Bonds to two years' probation, including 30 days' home confinement. *Id*. at 20.[3]

In *United States v. Tomasetta*, 10 CR 1205 (JSR) (S.D.N.Y. 2013), the defendants were two corporate executives who pleaded guilty to conspiracy to obstruct justice for creating

---

[3] Bonds' conviction was ultimately reversed on appeal. *United States v. Bonds*, 784 F.3d 582 (9th Cir. 2015).

backdated corporate minutes to document actual meetings.  In that case, in response to a *Wall Street Journal* article about its stock option granting practices, their company hired an outside law firm to conduct an internal investigation and anticipated an SEC investigation.  One issue relevant to the internal investigation was whether meetings of the company's compensation committee had taken place on particular days five years earlier.  Although hard copies of the minutes of these meetings existed, there were no electronic copies.  Anticipating that the outside law firm would ask for the electronic versions of these minutes, the executives re-typed the minutes and saved them on the computer of the employee responsible for maintaining such documents, including changing the computer's internal clock so it would appear that the documents had been created earlier.  Several days later, the executives disclosed to the law firm what they had done.  Def.'s Sentencing Mem. at 4-5, *United States v. Tomasetta*, No. 10 CR 1205 (JSR) (S.D.N.Y. Nov. 1, 2013) ECF No. 293; Gov't Letter to Court at 3-4, *Tomasetta* (S.D.N.Y. Nov. 1, 2013) ECF No. 294.  At sentencing, the government agreed that, "in light of the unique factual circumstances of this case," a sentence of probation was appropriate.  *Id*. at 5.  The Court agreed and sentenced both defendants to terms of probation.  Judgment at 2, *Tomasetta* (S.D.N.Y. Dec. 11, 2013) ECF No. 297.

B.  <u>History and Characteristics of the Defendant</u>

Section 3553(a)(1) also directs a district court to evaluate the "history and characteristics of the defendant" in determining the proper sentence for that individual.  "Highly relevant – if not essential to the selection of an appropriate sentence is possession of the fullest information possible concerning the defendant's life and circumstances."  *Pepper v. United States*, 562 U.S. 476, 480 (2011) (quoting *Williams v. New York,* 337 U.S. 241, 246-47 (1949)).  Underlying sentencing is "the principle that 'the punishment should fit the offender and not merely the crime.'"  *Id*. at 487-88 (quoting *Williams*, 337 U.S. at 247).

In fashioning an appropriate sentence for Mr. Cohen, the character and positive personal qualities he has exhibited over a lifetime must surely play as large a part as the single failing which brings him before the Court. *See United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("But surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance"), *aff'd in part*, 237 F. App'x 713 (2d Cir. 2007). Of "the many features of [a] case that bear on" the court's sentencing decision, some are incorporated into the Sentencing Guidelines but "many are not." *U.S. v. Ovid*, 09 CR 216 (JG), 2010 WL 3940724 at *6 (E.D.N.Y. October 1, 2010).

When the nature of the offense, as described above, is viewed in combination with Mr. Cohen's personal history and character, it is even more readily apparent that a prison sentence would be "greater than necessary" to serve the purposes of § 3553(a).

1. <u>Mr. Cohen is a First-Time Offender Who Has Led An Otherwise Positive Life</u>

Mr. Cohen is a 48-year-old man who has never before been in trouble with the law. Both the Supreme Court and lower courts have repeatedly recognized that a defendant's lack of criminal history may serve as a mitigating factor justifying a non-guidelines sentence. *Gall v. United States*, 552 U.S. 38, 57 (2007) (affirming district court's non-guidelines sentence based, in part, on defendant's lack of serious criminal history); *Kimbrough*, 552 U.S. at 109-110 (affirming non-guidelines sentence where district court "properly homed in on the particular circumstances of Kimbrough's case," including his lack of prior felony convictions). *See also Johnson*, 2018 WL 1997975 at *5; Sentencing Tr. at 37, *United States v. Saltsman*, 07 CR 641 (NGG) (E.D.N.Y. July 28, 2010) ECF No. 163; Sentencing Tr. at 37-40, *United States v. Schulman*, 16 CR 442 (JMA) (E.D.N.Y. Sept. 26, 2017) ECF No. 155.

In his 48 years, Mr. Cohen has lived a life that stands in sharp contrast to the single, albeit serious, mistake that brings him before the Court. Mr. Cohen was not born with a silver spoon in his mouth. Instead, his career and financial success are the product of his own hard work and drive. Throughout his life and career, one common theme has been Mr. Cohen's incredible work ethic: raising chickens and selling their eggs at age 7, working on a lobster boat in high school, washing dishes for extra money in college, working 110 hours per week in his first job out of college, and being at his desk in London at 6:00 am each morning even when he was the head of the office. *See supra* at pp. 4-8.

But Mr. Cohen's career success would have been meaningless to him had he not been able to balance it with time for his family and friends. As his work colleagues attested in their letters to the Court, despite his demanding work schedule, Mr. Cohen routinely skipped work-related social events so he could be home with his family for dinner every evening. A. Victor Letter (Ex. M) at 1; L. Thompson Letter (Ex. K) at 1. His friends have noted that he placed "family first, no exceptions," (A. Victor Letter (Ex. M) at 2) and describe him as "one of the most hands-on, dedicated fathers I have ever seen." Matthew Clarke Letter (Ex. N) at 1. One friend even went so far as to observe that "watching Michael be a father to his children makes me wish my own father had offered me even half of the support and care that Michael provides to his children." R. Roman Letter (Ex. Q) at 1.

Mr. Cohen has been a constant source of support for his children when they have faced challenges and disappointments in their young lives. ███████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████ When his son M.C. has had to deal with failure, Mr. Cohen has provided "unconditional, unadulterated and unequivocal support." R. Roman Letter

(Ex. Q) at 1. ██████████████████████████████████████

████████████████████████████████████ Mr. Cohen has also

handled many of the tasks that, performed day after day and year after year, are a revealing

measure of the depth of a parent's love: school pick-ups and drop-offs, packing school lunches,

helping with homework, attending school plays, cheering at sports practices and games, and

participating in parent-teacher conferences.  D. Gregory Letter (Ex. O) at 1; S. Leech Letter (Ex.

P) at 1.

Mr. Cohen has also been a steadfast friend to others.  One friend, Adam Victor, described

how Mr. Cohen helped him through a "personal family drama," noting that Mr. Cohen "was

there for me the whole way,…[H]e would call me, console me, guide me.  He became my rock

that I could confide in and count on."  A. Victor Letter (Ex. M) at 2.  Another friend, Simon

Leech, observed that Mr. Cohen was "one of the few people in life you can always count on

during difficult times, whatever the circumstances," and recounted the time that Mr. Cohen

offered to pay his employees to save his fledgling company.  S. Leech Letter (Ex. P) at 2.

Another personal friend, Matthew Clarke, offered a similar story, recalling that Mr. Cohen "was

never too busy to listen and was a shoulder for me to lean on during these difficult times.  Each

time, and without hesitation, Michael was there to provide me with support and whatever

assistance I needed."  Matthew Clarke Letter (Ex. N) at 1.  *See* A. Gregory Letter (Ex. J) at 1

("Michael is a man who I feel I could call upon at any time to help me or my children"); A.

Cohen Letter (Ex. D) at 2 (Michael "has always been a friend available for support and

guidance").

Mr. Cohen has also been generous with his time and financial support to his synagogue

and other charitable organizations.  Rabbi Salamon, the former leader of Mr. Cohen's

congregation in London, praised Mr. Cohen as "not only a worthy member of our Synagogue, but also of the wider community and society in which we live [who] works hard in bettering our troubled world." T. Salamon Letter (Ex. L) at 3. Rabbi Salamon described Mr. Cohen's continuous service to the Synagogue in various roles, saying that he "gave of his time freely," and "no task was too big or too small," yet he did all this "not expecting any thanks or gratitude." T. Salamon Letter (Ex. L) at 2. His contributions were so meaningful and his connection to his community so deep that, even after the negative publicity of the government investigation, when Mr. Cohen sought to step down as a synagogue trustee, his fellow members resisted this step. E. Glover Letter (Ex. T) at 1 (members "were reluctant to agree to his request as we valued his contribution to Synagogue affairs and saw no reason to distance ourselves from him").

Mr. Cohen has also demonstrated a consistent pattern of generosity to both friends and charitable causes. Both grand gestures and simple acts of kindness or friendship, they together reveal Mr. Cohen's character. As the examples discussed above (*supra* pp.16-18) demonstrate, Mr. Cohen recognizes he has been fortunate in life to have attained significant wealth and has felt a corresponding obligation to give back to others.

Finally, Mr. Cohen has fully accepted responsibility for his conduct. Shortly after his prompt correction of his misstatements to the government, in June 2013, Mr. Cohen sought to make amends for his potential conflict of interest in the Strata transaction by voluntarily making an $8.7 million restitution payment to the Charitable Foundation in order to put it back in the place it would have been if the transaction had never occurred. Notably, Mr. Cohen made this payment without any assurances that it would not be used against him as an admission of wrongdoing or liability in the then-pending government investigations or any private civil lawsuit. Then, when the charges in this case were unsealed in January 2018, Mr. Cohen did not

force the government to extradite him but instead chose to return voluntarily to address the charges against him, which was a significant concession in light of the fact that several recent high-profile U.S. requests to the U.K. for extradition have been denied by British courts.[4]  *See* Sentencing Tr.  at 38, *United States v. Saltsman*, 07 CR 641 (NGG) (E.D.N.Y. July 28, 2010) ECF No. 163 (citing as mitigating factor that defendant, who initially challenged extradition from foreign country, "ultimately chose to voluntarily travel to the United States to seek a resolution of this case").  In fact, Mr. Cohen had even advised the government over two years before the unsealing of the indictment that he would return voluntarily if charged.  Nor did Mr. Cohen seek to avoid the United States during the pendency of the government's investigation to avoid arrest.  In fact, he traveled here several times during this period, including once, in August 2016, when he directed his counsel to affirmatively inform prosecutors that he was coming to the United States and offer that, if the government intended to charge him, he would voluntarily surrender and appear as directed at the appropriate time for arraignment.  Finally, of course, Mr. Cohen has acknowledged his conduct before the Court and pleaded guilty to the false statement charge in this case.

In evaluating the sum total of Mr. Cohen's life to date, it is plain that his offense was out of character for him and in contrast to an otherwise positive life.  This Court and others have

---

[4]  For example, Stuart Scott, an HSBC trader whose securities fraud case was assigned to Your Honor, was successful last year in defeating U.S. extradition attempts.  *See* Gov't Letter to Court at 1-2, *United States v. Johnson, et al.,* 16 CR 457 (NGG) (E.D.N.Y. Oct. 23, 2018) ECF No. 259 (advising that U.S. appeals in U.K courts had been exhausted and extradition had been denied).  *See also Lauri Love Case: US Abandons Extradition Case,* BBC News, Feb. 19, 2018 (U.S. authorities announce that they will not challenge a British Court's refusal to extradite computer hacker) *available at* https://www.bbc.com/news/uk-england-suffolk-43119355#targetText=A%20Crown%20Prosecution%20Service%20spokesman%20confirmed%20Mr%20Love%20will%20not%20be%20extradited.&targetText=Mr%20Love%20is%20waiting%20to,attacks%20in%202012%20and%202013.

ny-1673615

repeatedly recognized that such circumstances are a significant mitigating factor in determining what sentence will be "sufficient, but not greater than necessary" to further the sentencing objectives of § 3553(a). Sentencing Tr. at 37, 41-42, *United States v. Saltsman*, 07 CR 641 (NGG) (E.D.N.Y. July 28, 2010) ECF No. 163 (probationary sentence was warranted where, among other factors, the offense conduct was in contrast to "a life which has had many positive elements for which the defendant should be proud"). *See also* Sentencing Tr. at 24, 38, *United States v. Schulman*, 16 CR 442 (JMA) (E.D.N.Y. Sept. 26, 2017) ECF No. 155 (non-custodial sentence was justified where defendant's insider trading was an isolated incident and represented a "marked deviation" from his otherwise law-abiding life); Sentencing Tr. at 64-65, 69-72, *United States v. Block*, 16 CR 595 (JPO) (S.D.N.Y. Nov. 8, 2017) ECF No. 169 (government conceded and court ruled that offense was "a deviation from [defendant's] personal history," since letters to Court attested to the fact that he was "a good father and a good family member and friend, who has had a genuinely positive effect on many people in his life"); *United States v. Khalid*, 09 CR 734 (JBW), 2011 WL 6967993 at *2 (E.D.N.Y. Dec. 13, 2011) (fact that defendant's structuring offense was "out-of-keeping" with defendant's otherwise lawful and responsible life was a mitigating sentencing factor); *United States v. DiAmbrosio*, 04 CR 66 (BWK), 2008 WL 732031 at *3 (E.D. Pa. March 13, 2008) (imposing probationary sentence on defendant stock trader whose offense was "a marked exception" to an otherwise law-abiding life, "as evidenced by the numerous letters submitted to Court on his behalf from family, friends and colleagues, praising his character and devotion to his family"); *Adelson*, 441 F. Supp. 2d at 513-14 (in analyzing history and characteristics of defendant, significant mitigating factor was Adelson's "exemplary" life, as demonstrated by letters to the Court attesting to his "good works and deep humanity" and "numerous acts of compassion and generosity"); *United States v.*

*Toback*, 01 CR 410 (RWS), 2005 WL 992004 at \*5 (S.D.N.Y. April 14, 2005) (defendant's conduct was an aberration in his normally law-abiding life, based upon "abundance of letters from [defendant's] family colleagues and friends [which] speak to his outstanding and reliable character, his devotion to his family and dedication to his business").

C.     A Probationary Sentence Would Reflect the Seriousness of the Offense
       and Provide Adequate Deterrence

In fashioning an appropriate sentence, the Court must also consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant.  18 U.S.C. § 3553(a)(2).  In Mr. Cohen's case, all of these purposes are properly served by a probationary sentence.

1.     A Probationary Sentence Would Properly Reflect the Seriousness
       of the Offense

First, under the unique circumstances of Mr. Cohen's offense, a probationary sentence would nonetheless reflect the seriousness of the offense, promote respect for the law and provide just punishment.  Having wrongly made false statements in an interview with the government, Mr. Cohen realized his serious error and accepted responsibility for his conduct by correcting his answers within days.  In addition, as a practical matter, Mr. Cohen's false statements did not ultimately impede the completion of the government's investigation and any misleading of the government was short-lived.  Under these circumstances, it is simply not the case that no other sentence than imprisonment will constitute just punishment.  Mr. Cohen will still bear the stigma of a felony conviction as well as loss of his profession and reputation and other collateral consequences, as described more fully below.  Under these circumstances, a probationary sentence will still adequately reflect the seriousness of the offense and promote respect for the law.  *See supra* pp. 26-29.

36

Indeed, the Supreme Court has recognized that the need for a sentence to promote respect for the law does not invariably weigh in favor of imposing a prison sentence whenever it is among the available sentencing options. In *Gall*, the Court specifically found that the facts of the defendant's case supported the district court's conclusion that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." 552 U.S. at 54. *See United States v. Walker,* 252 F. Supp. 3d 1269, 1291 (D. Utah 2017) ("the statute directs the court to consider the need for 'just punishment,' not punishment in and of itself"); *United States v. Stern*, 590 F. Supp. 2d 945, 956-57 (N.D. Ohio 2008) ("there is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist"); *DiAmbrosio*, 2008 WL 732031 at * 3, n.10 (given "heavy price" already paid by defendant, including loss of his job and loss of contact with his children, "a sentence of incarceration would not promote respect for the law, but may accomplish the opposite result"); *United States v. Coughlin,* No. 06-20005, 2008 U.S. Dist. Lexis 11263 at *22 (W.D. Ark. Feb. 1, 2008) (sentencing defendant with serious health problems to home confinement because prison conditions would endanger his life, and holding that "the Court is not unaware that the sentence imposed on Coughlin today will dismay those who feel that no punishment other than imprisonment can adequately punish [him]….But the Court is more concerned with engendering derision for the law in those aware of Coughlin's medical condition that might well be outraged by a criminal justice system that…produces a sentence plainly inhumane").

2.    <u>In Light of the Substantial Collateral Consequences Suffered by
      Mr. Cohen, a Probationary Sentence Will Provide Just Punishment</u>

In determining a just punishment in Mr. Cohen's individual circumstances, the fact that he has already suffered substantial collateral consequences also supports a probationary sentence. First, as a result of his conviction and the publicity from the lengthy government investigation, Mr. Cohen's ability to work in the finance industry and his professional reputation have been effectively destroyed. Numerous prominent articles about the investigation in the *Wall Street Journal* and other media identified Mr. Cohen as under investigation by the DOJ and SEC – virtually all for conduct for which he was never convicted or even charged. Now, he stands convicted of making a false statement to federal agents. As a result, his ability to work in the asset management industry – the one in which he has spent his entire professional career – is, for all practical purposes, over. He is extremely unlikely to ever be approved as an investment adviser by the SEC or the Financial Conduct Authority in the U.K., or to be hired by any investment firm. The career that he trained for and the industry that he reached the top of through his hard work and financial acumen is now permanently off limits to him. Although Mr. Cohen is fortunate enough to have ample financial resources for the future, this is nonetheless a steep price to pay for someone who is still a relatively young man (48) and who at one time was recognized as one of the most respected asset managers in Europe.

Mr. Cohen has also already paid a significant financial price for his conduct. As described above, in 2013, he voluntarily reimbursed the Charitable Foundation over $8.7 million, restoring it to the position as if it had never engaged in the Strata transaction.

In addition to the professional and financial consequences, Mr. Cohen's personal reputation is in tatters as a result of the investigation and his conviction. He is the subject of numerous media stories that will dog him the rest of his life every time someone googles him.

Former friends and business colleagues who have their own reputations to consider refuse to associate with him. The bank where he was a long-time client closed his accounts and numerous other banks have refused his business. Two different financial institutions have forced the closure of his 401(k) retirement accounts. Another bank cancelled his credit cards. Yet another bank cancelled his home mortgage, forcing him to scramble to find replacement financing. Moreover, such actions have not been limited to Mr. Cohen's own accounts. Another bank closed Mr. Cohen's wife's account, simply because of her association with him. Yet another bank closed the account of a private company simply because Mr. Cohen was a minority shareholder. When he sought to retain an attorney in London to assist him with his U.K. taxes, multiple law firms refused his business due to reputational issues. Private companies that he has considered investing in have expressed concern about the reputational impact of allowing him to become a shareholder.

The stigma from the investigation and his conviction have even interfered when Mr. Cohen has sought to lend assistance (both his time and financial support) to charitable causes. Recently, when he sought to make a donation to his daughter's school – where he had previously endowed a generous scholarship for disadvantaged girls – the school refused to accept it. Although his fellow congregants have remained supportive, Mr. Cohen voluntarily stepped down as a trustee of the Westminster Synagogue, where he was very active, in order to avoid any negative repercussions for his religious community and its work. E. Glover Letter (Ex. T) at 1; T. Salamon Letter (Ex. L) at 2. Mr. Cohen also sought to volunteer with the Association of Jewish Refugees (AJR), a charitable organization supporting Holocaust survivors in England. AJR volunteers visit survivors, most of whom are elderly, in their homes and give them someone they can talk or play a board game with or who can assist them with their daily activities, like

shopping or using a computer. However, due to the investigation and his conviction, Mr. Cohen was rejected as a volunteer. He was similarly rejected when he sought to volunteer at Nightingale House, a nursing home serving London's Jewish community, where he would have worked reading to and befriending its elderly patients.

The investigation and his conviction have also taken a severe personal toll on Mr. Cohen, and most distressing to him, his family. The stress, embarrassment and uncertainty of living under the threat of a criminal investigation have hung over Mr. Cohen's life and that of his family for seven years and sadly contributed to the decline of his marriage. His children have been faced with negative articles in the press and online about their father. They have been bullied in school as a result of the investigation. H. Cohen Letter (Ex. B) at 5. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ *See* Matthew Clarke Letter (Ex. N) at 2 ("Michael has suffered dramatically as a result of these investigations. He and his family have been exposed to constant slurs, innuendos and allegations in their daily lives….His entire life has been detrimentally impacted."); S. Leech Letter (Ex. P) at 2 ("this case has been extremely difficult for Michael and his family. I see how much it pains Michael to watch his family suffer. As [H.C.'s] godfather, she has confided in me about being bullied in school by other students. The students have made hurtful comments about her dad and the stories that have appeared in the press"); Melissa Clarke Letter (Ex. V) at 1 ("As the investigations carried on for months, then years, I watched Michael shoulder increasingly unbearable stress. His concern all this time was not for himself,…but for what his family was going through…That was what tortured him, with no end in sight."); I. Burn Letter (Ex. W) at 2 ("These last years have clearly taken a toll on

Michael's marriage…I believe Michael is devastated by the breakdown of his marriage and the hurt it is causing to everyone, especially the children. He has already paid a heavy price"); G. Keneally Letter (Ex. X) at 1 ("Michael and his family especially have had an extremely difficult 7 or 8 years with these legal issues. I know Michael to be a truly good person and it pains me to watch this matter disrupt his personal and professional life the way it has").



In her letter to the Court, Mr. Cohen's mother, Harriet Cohen, describes the effect on the family:

> Your Honor, the family has been torn apart by the investigation. [O.C., M.C. and H.C.] have been significantly impacted by the allegations and news stories about their father. Other children in their schools have tormented and taunted them by saying things like: "your father is a criminal." The case has also taken an enormous toll on Michael's marriage. He and Marisol are currently going through a difficult divorce that is having a negative impact on the children. Samuel and I are terribly worried about the further impact that Michael's potential absence will have on them. It is unbearable to think about. The family has already been through so much.

H. Cohen Letter (Ex. B) at 5.

Lisa Thompson, a family friend, echoes this assessment of the case's impact on Mr. Cohen and his family:

> I have seen the impact of these proceedings on Michael and his family. This has torn Michael apart, and the stress and uncertainty has caused the rift in his marriage. Michael's career and reputation he has built over decades has been

destroyed.  Yet most damaging for Michael has been the impact on his family.  I believe that Michael has truly suffered enough.

L. Thompson Letter (Ex. K) at 2.

In determining what sentence will be "sufficient, but not greater than necessary" to further the sentencing objectives of § 3553(a)(2) in this case, it is significant for the Court to take into account these negative collateral effects the investigation and conviction have already had on Mr. Cohen.  The Second Circuit, this Court and other district courts have consistently recognized that collateral consequences, such as the loss of a career or reputation, the disgrace of a felony conviction, or the emotional toll of the prosecution, are significant mitigating factors at sentencing.  *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (district court found that defendant translator's loss of his career "already visited substantial punishment" on him, and appellate court affirmed sentence, ruling that "it is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence"); *Johnson*, 2018 WL 1997975 at *5  (defendant financial trader's inability to work in financial industry again, as well as "expense and emotional harm" from prosecution and "disgrace" of felony conviction are mitigating factors warranting below-guidelines sentence); Sentencing Tr. at 39-40, *United States v. Saltsman*, 07 CR 641 (NGG) (E.D.N.Y. July 28, 2010) ECF No. 163 (fact that defendant had "already suffered as a result of his criminal conduct," including separation from his family for an extended period of time and "significant public embarrassment and shame" in his community were among the mitigating factors justifying a probationary sentence).  *See also* Sentencing Tr. at 37-40, *United States v. Schulman*, 16 CR 442 (JMA) (E.D.N.Y. Sept. 26, 2017) ECF No. 155 (defendant lawyer had already been subjected to "substantial and meaningful punishment" warranting a probationary sentence, including "loss of his law license and his ability to work in a profession that he clearly loves," damage to his

"professional reputation," the "social stigma that accompanies any felony conviction," and emotional suffering); Sentencing Tr. at 70-72, *United States v. Block*, 16 CR 595 (JPO) (S.D.N.Y. Nov. 8, 2017) ECF 169 (ruling that, for the defendant accountant, the fact of a felony conviction and his inability to maintain his profession was "significant punishment in itself" and was a mitigating factor); Sentencing Tr. at 31, *United States v. Collins*, 07 CR 1170 (LAP) (S.D.N.Y. July 15, 2013) ECF No. 244 (fact that defendant lawyer had experienced a "very long fall from grace," including loss of his law license and "his considerable standing in the legal community" was among the mitigating factors warranting a below-guidelines sentence); *DiAmbrosio*, 2008 WL 732031 at *3 (imposing probationary sentence on defendant stock trader who "already has paid a heavy price" for his offense, including loss of his job, being barred from securities industry and a divorce which deprived him of daily contact with his children).

3.     A Probationary Sentence Will Afford Adequate Deterrence

Finally, § 3553(a)(2) requires the Court to consider the need for both general and specific deterrence when imposing sentence. Here, the Court can have a high degree of confidence that Mr. Cohen will not commit future crimes.[5] First, Mr. Cohen will almost certainly have no opportunity to commit a similar offense in the future since he is extremely unlikely to ever find himself caught up in a federal criminal investigation again. More broadly, he is also highly unlikely to ever work in the investment advisory business, the industry that gave rise to the government's investigation here. Enduring an eight-year long government investigation that

---

[5] Even though there is virtually no chance that Mr. Cohen would become involved in future criminal activity anywhere, it bears mentioning that he lives in a foreign country (England) and thus the likelihood that he would ever commit another crime in the United States is exceedingly remote. *See* Sentencing Tr. at 40, *United States v. Saltsman*, 07 CR 641 (NGG) (E.D.N.Y. July 28, 2010) ECF No. 163 (in assessing risk of recidivism and need for specific deterrence, foreign resident defendant who planned to return to his home country following sentencing "certainly does not create a risk to anyone here").

disrupted his life, cost him his career and reputation, harmed his family and left him with a felony conviction will certainly act as a sufficient deterrent to Mr. Cohen engaging in any illegal activity in the future, even in the absence of a sentence of imprisonment.

Nor is a prison sentence necessary to serve general deterrence purposes. Even if Mr. Cohen were to receive a probationary sentence, no potential future witness in a white collar investigation would observe the effects of this case on Mr. Cohen – being branded a felon for life; the loss of his job and career; a shattered reputation; the anxiety of living with a criminal investigation hanging over his head; and most significantly, the terrible emotional toll on his family and his relationship with his wife and children – and think that there is just a small price to pay for lying to federal prosecutors. The significant negative consequences visited upon Mr. Cohen as a result of his conduct and conviction, even without a prison sentence, will send a sufficient message of deterrence to any future person in a similar circumstance. *See* Sentencing Tr. at 90, *United States v. Connolly*, 16 CR 370 (CM) (S.D.N.Y. Oct. 24, 2019) ECF No. 425 (fact that defendant traders who were convicted of rigging LIBOR submissions endured "arrest, …the loss of jobs and employability, the financial stress on them and their families, [and] the loss of status in the community" was sufficient to accomplish general deterrence of other traders in securities markets and therefore incarceration was unnecessary).

> D.     The Court Should Employ Alternatives to Incarceration

18 U.S.C. § 3553(a)(3) also requires the Court to consider "the kinds of sentences available" in a given case. This Court, as well as other judges, have recognized how punitive even a short prison sentence is. *See Johnson*, 2018 WL 1997975 at * 5 ("let me be clear: any amount of prison time is a serious amount of prison time"); *United States v. Mateo*, 299 F. Supp. 2d 201, 210 (S.D.N.Y. 2004) (taking into account at sentencing "the countless humiliations and indignities commonly associated with" incarceration). *See also* Anthony M. Kennedy, Associate

Justice, Supreme Court of the United States, Address at the ABA Annual Meeting (Aug. 9, 2003) at p. 3, *available at* https://www.supremecourt.gov/publicinfo/speeches/viewspeech/sp_08-09-03 ("One day in prison is longer than almost any day you and I have had to endure").

Moreover, both the Sentencing Reform Act and the Sentencing Guidelines specifically encourage non-jail sentences in cases like Mr. Cohen's.  The Sentencing Reform Act endorses "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."  28 U.S.C. § 994(j).  Similarly, as a result of a 2018 amendment to the Sentencing Guidelines, Application Note 4 to § 5C1.1 now specifically directs that "If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment."  *Id*.

Here, the Court has available forms of punishment other than imprisonment which will permit it to craft an appropriate sentence for Mr. Cohen: probation, fines, and if the Court feels them necessary, home detention and community service.  Indeed, employing some combination of these types of sentences will allow the Court to both punish Mr. Cohen sufficiently, while permitting him to continue to maintain regular contact with his children, pursue his work and contribute to his community.  In light of the substantial mitigating factors in his favor, the availability of these alternatives under the law weighs in favor of the Court's use of them and against the imposition of a prison sentence.

Notably, a probationary sentence for Mr. Cohen would be a guideline sentence, consistent with his 0 to 6 months advisory range.  PSR ¶ 63.  If the Court imposes a probationary sentence, Mr. Cohen would request permission to serve his probation at home in the U.K.  This

Court and others have approved defendants who are residents of a foreign country serving their probation in their home countries. *See* Sentencing Tr. at 44, *United States v. Saltsman*, 07 CR 641 (NGG) (E.D.N.Y. July 28, 2010) ECF No. 163 (defendant to serve probation and perform community service in Israel); Sentencing Tr. at 92, 95, *United States v. Connolly*, 16 CR 370 (CM) (S.D.N.Y. Oct. 24, 2019) ECF No. 425 (defendant to serve probation and home confinement in United Kingdom); Judgment, *United States v. Yabe*, 18 CR 726, (D.N.J. May 22, 2019) ECF No. 14 (defendant to serve probation in Japan); Sentencing Tr. at 16-17, *United States v. Curtler*, 15 CR 670 (CM) ) (S.D.N.Y. April 9, 2019) ECF No. 28 (defendant to serve probation in United Kingdom); *United States v. Stewart*, 14 CR 272 (JSR) (S.D.N.Y. Feb. 8, 2017 and Feb. 22, 2017) ECF Nos. 275, 277  (defendant to serve probation in United Kingdom); *United States v. Yagami*, 14 CR 272 (JSR) (S.D.N.Y. Feb. 21, 2017 and March 13, 2017) ECF Nos. 276, 282 (defendant to serve probation in Hong Kong); *United States v. Robson*, 14 CR 272 (JSR) (S.D.N.Y. Nov. 21, 2016) ECF No. 267 (defendant to serve probation in United Kingdom); *United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (district court permitted defendant to serve probation in Belgium).  Moreover, the record is clear that Mr. Cohen requires little, if any, supervision during a probationary term – he has had no further brush with the law since the offense of conviction in 2013 even though he has been under the government microscope for six years and under the supervision of Pre-Trial Services while living in London on bail for the last 16 months.

If the Court determines that home confinement is a necessary aspect of Mr. Cohen's probation, Mr. Cohen would request that he be permitted to serve this period at his home in the U.K. in order to allow him to maintain his relationship with his children.[6]  If the Court requires

---

[6] Mr. Cohen will bear the costs of whatever level of monitoring the Court deems appropriate.

that home confinement be served here in the U.S., Mr. Cohen will arrange to live at his parents'
or his brother's home in Maine, or some other suitable location.[7]

Similarly, if the Court believes that community service is a necessary part of a sentence
for Mr. Cohen, he is already volunteering at his synagogue and a local hospital and verification
of his work can be obtained and provided to the Probation Department as needed.

E.    Sentencing Statistics Indicate A Probationary Sentence is Appropriate for
      Mr. Cohen

The Court must consider the applicable advisory guideline range and Sentencing
Commission policy statements pursuant to 18 U.S.C. § 3553(a)(4) and (5). Here, any sentence
greater than a probationary one – whether it represents the bottom of the 0 to 6 months advisory
range calculated in the PSR (¶ 63) or a modest variance from the guideline range advanced by
the government – would be "greater than necessary" to serve the purposes of sentencing in Mr.
Cohen's case.

Figures published by the Sentencing Commission indicate that, in the most recent 2018
fiscal year, only 25.4% of defendants in the Eastern District have been sentenced within the
applicable guideline range. U.S. Sentencing Commission, *2018 Annual Report and Sourcebook
of Federal Sentencing Statistics* at Table 30, available at

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-
sourcebooks/2018/Table30.pdf. For the same time period, the rate of within-guideline sentences
in the Southern District of New York was essentially the same (25.5%). *Id.* Virtually all those
sentenced outside the guideline range were sentenced *below* the range. *Id.* As a result, to look to

---

[7] *See* Guidelines § 5F1.2, Application Note 3 (defendant's place of residence, for purposes of
home detention, need not be the place where the defendant previously resided, so long as the
owner of the residence agrees to any conditions imposed by the Court).

the applicable guideline range as even a rough indication of what most defendants or the average defendant is sentenced to for a given offense – and accord it weight on that basis – is plainly incorrect. Indeed, the exact opposite is true – a clear majority of all defendants in this District and the neighboring district (nearly 75%) are sentenced *below* the guideline range. Even excluding cooperators who receive a § 5K1.1 letter, over 50% of Eastern District defendants receive a below-guideline sentence. *Id.* Indeed, the exception has swallowed the rule, and rather than being a proxy for what sentence the typical defendant should receive, the guideline range is now more accurately viewed as an indication of the typical sentence imposed on the 25% of Eastern District defendants who are most culpable or least deserving of leniency, a group which plainly does not include Mr. Cohen. The conclusion is inescapable that the typical Eastern District defendant now receives a below-guidelines sentence. Since there are significant mitigating factors that distinguish Mr. Cohen from even the typical defendant, and since he is in the lowest advisory guideline range to begin with, any sentence above the bottom of his 0 to 6 months range would be "greater than necessary" to achieve the sentencing purposes of § 3553(a)(2). Likewise, any sentence in the advisory guideline range advocated by the government would be plainly inconsistent with the treatment of other defendants in the Eastern District, the vast majority of whom are sentenced below the guideline range.

      F.    <u>Imposing a Prison Sentence On Mr. Cohen Would Create Unwarranted Sentencing Disparities</u>

Also included among the § 3553(a) factors to be considered by the Court at sentencing is the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). Here, as described above, this factor strongly weighs in favor of a probationary sentence for Mr. Cohen. To sentence Mr. Cohen above the bottom of the applicable advisory range when roughly 75% of all Eastern District defendants are

sentenced below the range itself would affirmatively create an unwarranted disparity between his sentence and that of other similarly situated defendants.[8]

## CONCLUSION

For the foregoing reasons, we respectfully submit that any sentence involving incarceration for Mr. Cohen would be "greater than necessary" to serve the statutory sentencing objectives. Instead, we request that, in light of the unique circumstances of Mr. Cohen's offense and his otherwise positive life, the Court exercise its discretion to impose a sentence of probation, which would punish Mr. Cohen sufficiently yet still permit him to rebuild his life and make a positive contribution to his community.

Dated:    November 5, 2019

---

[8] The final statutory factor required to be considered by the Court at sentencing, the need to provide restitution to victims of the offense (18 U.S.C. § 3553(a)(7)), is inapplicable here.

ny-1673615

Respectfully submitted,

MORRISON & FOERSTER LLP


By:     */s/ Ronald G. White* _____
           Ronald G. White
           Amanda Aikman
           250 West 55th Street
           New York, NY  10019
           (212) 468-8016
           Counsel for Defendant Michael L. Cohen


KRAMER, LEVIN, NAFTALIS & FRANKEL LLP


By:     */s/ Paul H. Schoeman* _____
           Paul H. Schoeman
           1177 Avenue of the Americas
           New York, NY  10036
           (212) 715-9264
           Counsel for Defendant Michael L. Cohen

ny-1673615