

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AES:DCP/JPM/JPL/GMM
F. #2017R01739

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 15, 2019

<u>By Hand and ECF</u>

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  United States v. Michael Leslie Cohen
      <u>Criminal Docket No. 17-544 (NGG)</u>

Dear Judge Garaufis:

    The government respectfully submits this letter in advance of the sentencing of the defendant, Michael Leslie Cohen, which is scheduled for November 19, 2019.  The defendant pled guilty, pursuant to a plea agreement, to one count of making a false statement, in violation of 18 U.S.C. § 1001.  The United States Probation Office ("Probation") issued a Presentence Investigation Report, dated September 30, 2019, and an Addendum to the Presentence Report, dated October 23, 2019 (together, the "PSR").  The PSR calculated that the defendant's total offense level was 4 and that his Criminal History Category was I, leading to a sentencing range of 0 to 6 months' imprisonment under the United States Sentencing Guidelines ("USSG" or the "Guidelines").  As explained below, this calculation is erroneous because the offense level should be determined under USSG § 2J1.2, which covers obstruction of justice—the actual offense conduct here.  Correctly calculated, the defendant's Guidelines range is 10 to 16 months' imprisonment.  For the reasons stated below, the government respectfully requests that the Court find that the applicable Guidelines range is 10 to 16 months' imprisonment, and impose a sentence within that range.

I.      Factual Background

A.      The Defendant's Background and Relationship with Co-Conspirator 1

The defendant's conviction is the culmination of years of secret dealings and off-the-books transactions with a London-based businessman and fixer ("Co-Conspirator 1").  The defendant's obstruction and lies show that he believed the rules of fair dealing and honesty did not apply to him, a wealthy expatriate at the highest levels of the financial industry in London.  In attempting to hide the full extent of his relationship with Co-Conspirator 1, the defendant passed false documents to the U.S. Securities and Exchange Commission ("SEC") and lied repeatedly to the government in the hopes of avoiding the moment of accountability he now faces.

The defendant left the modest circumstances of his upbringing decades ago.  After attending Bowdoin College, he pursued a career in finance in New York, first as a junior investment banker at Credit Suisse First Boston and then as a financial analyst in New Jersey.  In 1997, the defendant joined Och-Ziff Capital Management Group LLC ("Och-Ziff"), which at the time was a small New York-based hedge fund.  In 1999, he moved to London to open the firm's office there and ultimately became an Executive Managing Director, head of Och-Ziff's European operations and one of the firm's top partners.  As a result of his employment at Och-Ziff, the defendant became extremely wealthy.  It has been reported that by the time the defendant was 41 years old, he had amassed more than a half-billion dollars and had purchased an estate in the English countryside that was once owned by the Duke of Wellington.  (See Ex. A, "$600m hedgie hangs up his booth," The Times, March 31, 2013.)  As the defendant ascended the London financial scene, he grew accustomed to a life of private jets, high-end vacations and privileged treatment.

The defendant's financial background was in equities trading.  However, by the mid-2000s, he began to pursue for Och-Ziff a number of private-side investments in real estate, oil, and mining that would eventually draw significant scrutiny from the government.  Specifically, the defendant began exploring highly risky deals in emerging markets, including Eastern Europe and Africa.  The defendant's foray into private investing was aided in significant part by Co-Conspirator 1, a London-based businessman whom the defendant met through mutual acquaintances at a London investment bank.  In 2006, Co-Conspirator 1 arranged for Och-Ziff to participate in a private investment in an oil field in Kazakhstan.  As Co-Conspirator 1 brought in additional deals, the defendant and Co-Conspirator 1 became friends.  The defendant quickly learned that Co-Conspirator 1 had significant business connections in Gaddafi's Libya.[1]

In the fall of 2007, the defendant approved a $40 million private investment by Och-Ziff into a Libyan real estate project run by Co-Conspirator 1.  In December 2007, the

---

[1]      According to a 2007 background report commissioned by Och-Ziff on Co-Conspirator 1, "[Co-Conspirator 1's company] uses special purpose vehicles based offshore that have no subsidiaries, no employees and no operations other than relating to the transaction for which they were established.  This, and their activities as 'fixers', means that there is little documented evidence of the company's activities either in the UK or internationally."  The report further stated that Co-Conspirator 1's "associates report him to have been very active in Libya and Qatar where he has excellent and far reaching contacts."

Libyan Investment Authority ("LIA"), a sovereign wealth fund managed by the government of Libya, invested $300 million into Och-Ziff hedge funds. In connection with the LIA investment, the defendant authorized Och-Ziff to pay a "fee" to Co-Conspirator 1.

In the fall of 2008, Co-Conspirator 1 asked the defendant if Och-Ziff would make him a personal loan of $18 million. According to the defendant, Och-Ziff would not give Co-Conspirator 1 an unsecured loan. Co-Conspirator 1 then asked the defendant to personally provide the $18 million loan and the defendant agreed. The purpose of the loan was to enable Co-Conspirator 1 to make a financing payment on a luxury yacht. In December 2008, the defendant loaned $18 million to Co-Conspirator 1 at a 30% interest rate and a term of four months. This loan was secured in part by Co-Conspirator 1's financial interest in a small oil and gas holding company called Strata Limited ("Strata").

Co-Conspirator 1 immediately became delinquent in paying the loan back to the defendant. As the principal grew at a 30% interest rate, the defendant began demanding repayment. For example, on January 6, 2010, the defendant wrote to Co-Conspirator 1's business partner: "Any update. I am starting to get disturbed and nervous. I was counting on the money." In June 2010, the defendant again followed up about the loan, and claimed that he "was writing a check based on belief funds are coming today." By the fall of 2010, Co-Conspirator 1 owed the defendant approximately $20 million on the original $18 million loan. The defendant kept track of Co-Conspirator 1's debt using a daily spreadsheet with the outstanding loan balance.

B.    The Strata Transaction

The loan for the luxury yacht was one of many business relationships between the defendant and Co-Conspirator 1, and ultimately led to the defendant's crime. The defendant had personally loaned Co-Conspirator 1 a significant sum of money, and at the same time he continued to have Och-Ziff invest in Co-Conspirator 1's Libyan real estate project, used Co-Conspirator 1 as a source of potential deals and negotiated transactions involving companies in which Co-Conspirator 1 and Och-Ziff were investors. This opaque maze of competing interests is the backdrop of the defendant's obstruction.

As noted above, Co-Conspirator 1 was a shareholder in Strata. In November 2010, the defendant agreed with three Strata shareholders – Co-Conspirator 1, a South African business partner ("Co-Conspirator 2") and a third investor – that an Och-Ziff joint venture would purchase 10% of the outstanding shares of Strata. The Charitable Foundation, a United Kingdom-based charitable organization, was an investor in the joint venture that was to purchase the Strata shares. Pursuant to agreements executed by the Charitable Foundation when it invested in the joint venture, the Charitable Foundation had to consent to any related party transactions.

At the time he negotiated the Strata transaction, the defendant had a security interest over Co-Conspirator 1's Strata shares through the $18 million yacht loan. When the defendant arranged this transaction, Co-Conspirator 1 owed the defendant more than $20 million. The defendant did not disclose to the Charitable Foundation that he had a conflict of interest because one of the proposed sellers of Strata shares that the joint venture planned to purchase owed the defendant almost $20 million. Because the Charitable Foundation was in the dark, it

did not know to ask the defendant whether Co-Conspirator 1 was going to repay the defendant using proceeds from his sale of Strata shares, which is exactly what happened.

By early December 2010, the defendant identified a second conflict of interest with the proposed Strata transaction. Specifically, he recognized that the Charitable Foundation would not approve the Strata transaction if Co-Conspirator 2 – who was both an investor in the joint venture and an owner of Strata shares – were a seller. As with other situations he encountered, the defendant turned to Co-Conspirator 1 to handle the behind-the-scenes work to complete the deal. This time, the defendant arranged for Co-Conspirator 1 to sell Co-Conspirator 2's shares without notifying the Charitable Foundation of the arrangement. And, at the same time that the deal's terms were being finalized, the defendant negotiated an extension of the terms of his loan to Co-Conspirator 1. According to these terms, Co-Conspirator 1 agreed to make a $4 million partial payment on the yacht loan to the defendant on or before December 31, 2010.

On December 24, 2010, the Strata transaction closed. On December 29, 2010, Co-Conspirator 1 was paid approximately $9,349,900 from the transaction proceeds. That same day, Co-Conspirator 1 wired the defendant $4,000,000 in partial repayment of the yacht loan.

C.    The Government's Investigation and the Backdated Letter

In June 2011, the SEC commenced an investigation of Och-Ziff's business with the Libyan government, including the fees that Och-Ziff paid to Co-Conspirator 1 for deals involving Libya. From the beginning, Co-Conspirator 1's relationship and dealings with the defendant were a central focus of the investigation. On February 14, 2012, the SEC served a subpoena on Och-Ziff that required the hedge fund to produce, among other things, all documents related to Co-Conspirator 1 and the LIA investment.

Several weeks after Och-Ziff received that subpoena, in March 2012, the defendant approached Co-Conspirator 1 and advised him that Och-Ziff was under investigation by the SEC. The defendant and Co-Conspirator 1 discussed that Co-Conspirator 1 would write a letter stating that Co-Conspirator 1 would not use any proceeds from the Strata transaction to repay his personal loan to the defendant. Co-conspirator 1 then provided the defendant with a letter dated October 14, 2010 (the "Backdated Letter"). The Backdated Letter was designed to give the appearance that the defendant was absolved of the exact conflicts related to the Strata transaction that the SEC was investigating. As he admitted at his plea hearing, the defendant knew and intended that the Backdated Letter would create the "false impression" to the SEC that the letter had been created in October 2010. Shortly after the defendant received the Backdated Letter from Co-conspirator 1, he provided it to an in-house attorney at Och-Ziff and represented that it was responsive to the SEC's subpoena.

The Backdated Letter is about much more than a date. It purports to absolve the defendant of a $4 million fraud – namely that, as a principal of Och-Ziff, he arranged a transaction for his own personal profit.

On September 24, 2012, the SEC served the defendant with a subpoena in his personal capacity. This subpoena required the defendant to produce, among other things, all documents related to Co-Conspirator 1 and the LIA investment. On or about November 27, 2012, the defendant, through his attorney, produced the Backdated Letter to the SEC in response

4

to its subpoena.  At that point, Och-Ziff still had not produced the Backdated Letter to the government.

In January 2013, a federal grand jury in the Eastern District of New York ("EDNY") opened a criminal investigation into the activities of Och-Ziff, the defendant, and Co-Conspirator 1.  The significant financial and personal relationship between the defendant and Co-Conspirator 1 was again a central focus of that investigation in early 2013.  From bank records, the government learned in early 2013 that, on or about December 30, 2010, Co-Conspirator 1 paid the defendant approximately $4 million from the proceeds of the Strata sale.  The government informed the defendant of this information during an April 4, 2013 voluntary interview of the defendant.  Investigators from the SEC, the Federal Bureau of Investigation ("FBI"), and the Internal Revenue Service ("IRS") participated in the interview.  At the interview, the defendant said that Co-Conspirator 1 had given the defendant a letter stating that no proceeds from the Strata transaction would be used by Co-Conspirator 1 to pay the defendant back for the luxury yacht loan.  The defendant did not disclose that this letter was backdated.

Counsel for Och-Ziff's audit committee met with the government on May 9, 2013, at the United States Attorney's Office for the EDNY, in connection with the government's investigations.  At this meeting, Och-Ziff's audit committee counsel produced a hardcopy of the Backdated Letter to the government.  At the time that the government met with audit committee counsel, the defendant was scheduled to meet with the government on May 30, 2013 for a second interview.

On May 29, 2013, one day before the defendant's second scheduled interview, his attorney spoke with the government about the Backdated Letter.  The defendant's counsel described his client's version of events surrounding the Strata transaction and then added that the Charitable Foundation had recently been informed of issues concerning the Strata transaction.  The government learned on the call that the defendant would be paying approximately $8.7 million to the Charitable Foundation and that the defendant would be prepared to discuss the basis of the numbers during the May 30, 2013 interview.

The next day, following this significant buildup concerning the Strata transaction, the defendant sat for a second voluntary interview with the government.  Once again, investigators from the SEC, FBI, and IRS attended the interview.  Despite mounting evidence that the transaction was rife with conflicts, which led to the defendant's decision to repay $8.7 million to the Charitable Foundation, the defendant decided to keep obstructing the government's investigation, by continuing to maintain that the Backdated Letter was accurately dated and that he had received it in October 2010.  By vouching for the Backdated Letter, the defendant lied about what had become a critical issue in the investigation.  His obstruction had as much to do with keeping a lid on the extent of his relationship with Co-Conspirator 1 as it did with the specifics of the letter itself.

Recognizing that the evidence against him was mounting and that the government was aware of far more information than he previously believed, the defendant authorized his attorney to finally confess his falsehoods.  On June 3, 2013, the defendant's attorney called the government and said that his client wished to correct statements he had made during the May 30 interview.  The defendant's attorney told the government, among other things, that the defendant had not received the Backdated Letter in October 2010, as he had stated during the May 30

interview with the government. The defendant's attorney said that the defendant had, in fact, received the Backdated Letter in March 2012 and that he knew it was backdated to October 2010 when he received it. The defendant's attorney also said that, after Och-Ziff received a subpoena from the SEC, the defendant provided the Backdated Letter to in-house counsel at Och-Ziff. The defendant's attorney made this call to the government <u>eight weeks</u> after the defendant first lied about the Backdated Letter in the April 4, 2013 interview.

II.     Sentencing Guidelines Range

        A.      Guidelines Calculation

        The government respectfully submits that the appropriate Guidelines calculation is set forth below:

Base Offense Level (USSG § 2J1.2(a))                                             14

Minus:  Acceptance of Responsibility (§ 3E1.1(a))                               <u>-2</u>

Total Offense Level:                                                            <u>12</u>

        The defendant has a criminal history score of zero and a Criminal History Category of I. (PSR ¶ 36). Based on a total offense level of 12 and a criminal history category of I, the defendant's Guidelines range of imprisonment is 10 months to 16 months.

        In the PSR, Probation, using USSG § 2B1.1, determined a final offense level of 4 and a Guidelines range of 0 to 6 months' imprisonment. (PSR ¶¶ 33, 36, 63). The government objected and argued that the Probation Department should use USSG § 2J1.2(a) (Obstruction of Justice). The Probation Department rejected the government's objection.

        In his sentencing memorandum ("Def. Memo"), the defendant agrees with the Probation Department's Guidelines calculation and argues that the applicable Guidelines range is 0 to 6 months' imprisonment. The government disagrees.

        There are three obstruction related charges in the Indictment: the defendant was charged in Count 8 with conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k); in Count 9 with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2); and in Count 10 with material false statements, in violation of 18 U.S.C. § 1001(a)(2). Although the defendant pled guilty to false statements, the Guidelines range for obstruction of justice is applicable for the following reasons.

        1.      The Defendant Obstructed Justice

        The defendant's conduct obstructed justice. 18 U.S.C. § 1512 provides in pertinent part that "(c) [w]hoever corruptly . . . (2) . . . obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both." While "an official proceeding need not be pending or about to be instituted at the time of the offense," <u>id.</u> § 1512(f)(1), "the government must prove that such a proceeding was reasonably foreseeable to the defendant." <u>United States v. Martinez</u>, 862 F.3d

6

223, 237 (2d Cir. 2017) (citations omitted), vacated on other grounds by Rodriguez v. United States, 139 S. Ct. 2772 (2019).  The government must also show that "there was a 'nexus' between the defendant's conduct and the pending, or foreseeable, official proceeding." Martinez, 862 F.3d at 237 (citations omitted).  "To satisfy this requirement, the defendant's conduct must have a relationship in time, causation, or logic with the judicial proceedings; in other words, the endeavor must have the natural and probable effect of interfering with the due administration of justice."  United States v. Reich, 479 F.3d 179, 185 (2d Cir. 2007) (citation and internal quotations omitted).  In addition, the defendant's acts need not be successful in impeding or obstructing justice because the defendant need only have "'attempt[ed]'" to impede or obstruct an official proceeding under Section 1512(c)(2).  Martinez, 862 F.3d at 238 (quoting 18 U.S.C. § 1512(c)(2)).

An "official proceeding" for purposes of Section 1512 includes, among other things, "a proceeding before a Federal Government agency which is authorized by law."  18 U.S.C. 1515(a)(1)(C).  Here, the SEC and EDNY grand jury investigations were "official proceedings" for purposes of the statute.  See United States v. Perez, 575 F.3d 164, 169 (2d Cir. 2009) (declining to decide whether "agency investigations in general" are "official proceedings" under Section 1512(c)(1), but holding that an internal Bureau of Prisons investigation was an "official proceeding" because it "contemplate[d] more than a preliminary investigation" and "set[] forth a detailed process of review and decision-making").  Like the Bureau of Prisons in Perez, the SEC and the EDNY grand jury had opened official investigations that similarly followed a detailed process of review and decision-making.

The defendant attempted to – and did – obstruct the SEC and EDNY grand jury investigations.  During his plea allocution, the defendant admitted just that.  Specifically, the defendant stated that in response to an SEC subpoena, he produced the Backdated Letter with the October 2010 date, when he "knew [the date] would create the false impression to the government investigators that the . . . agreement had been documented in writing at that time." (Plea Hearing Tr., Dkt. 52, at 27:4-7).  The defendant understood that SEC investigators would have given more weight to a letter that was actually created in 2010 – before the Strata transaction – than they would have given to a backdated letter, which looks like a cover-up.  The defendant therefore knew that producing the Backdated Letter would deceive the SEC investigators and impede their investigation, but he did it anyway.

The defendant provided the Backdated Letter to Och-Ziff in late March 2012, knowing that it would be produced from the company to the SEC; he subsequently produced the Backdated Letter to the SEC himself in November 2012.  For months after these actions, the defendant could have told the truth.  Instead, in early April 2013, when he first sat down for an interview with the government, the defendant said that Co-Conspirator 1 had given the defendant a letter stating that no proceeds from the Strata transaction would be used by Co-Conspirator 1 to pay the defendant back for the luxury yacht loan.  The defendant did not disclose that such letter was backdated and, by not doing so, he made a choice to continue his obstruction.

By May 2013, as the government's investigation was becoming increasingly focused on the Strata transaction, the defendant doubled down.  Having been questioned by the government about the Backdated Letter, the defendant decided to pay $8.7 million to the Charitable Foundation without giving notice to the government or acknowledging the specific

7

problems with the transaction.  He then sat for the late May 2013 interview knowing that he would be asked to explain the transaction and the Backdated Letter in great detail.  And yet the defendant lied again.  Despite repeated questioning about whether the Backdated Letter was, in fact, backdated, the defendant maintained that it was not.

The defendant now argues that he "quickly recognized his error and sought to acknowledge it" by asking his lawyer to "correct his misstatement the very next day."  (Def. Mem. at 25).  But like his prior "admissions," this one again ignores the context – the defendant had been caught red-handed and made a half-hearted attempt to save face.  He had presumed that he could buy his way out of the problem by making an $8.7 million payment to the Charitable Foundation.  But that is not what happened.

The defendant did not make a one-time, spur of the moment mistake in the May 2013 interview and quickly correct the "error."  The defendant had been obstructing the SEC investigation for <u>over a year</u>, and he only admitted it <u>after</u> the government pointedly asked him whether it was true that the Backdated Letter was not backdated.  The defendant could tell from the government's questions, and its responses to his answers, that the government knew he was lying.  What the defendant "quickly recognized" the day after the May 2013 interview was that his obstruction was no longer working, and so he changed his story.

    2.    <u>The Obstruction of Justice Guidelines Apply</u>

The Court should calculate the defendant's offense level using Section 2J1.2 of the Guidelines, which covers obstruction of justice.  Section 1B1.2(c) provides that "[a] plea agreement (written or made orally on the record) containing a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant had been convicted of additional count(s) charging those offense(s)."

Although the plea agreement did not contain a written stipulation, the defendant and the government negotiated and agreed upon the exact language of the defendant's allocution at his plea hearing.  As the defendant's attorney said at the plea hearing, "Mr. Cohen is going to read from a statement that we worked out with the government."  (Plea Hearing Tr., Dkt. 52, at 25:16-17).  This negotiated allocution was a key component of the plea agreement between the government and the defendant, and thus it qualifies as a "stipulation" for purposes of Guidelines Section 1B1.2(c).[2]

_____

    [2]    The application note for Section 1B1.2 provides, in relevant part, that "[a] factual statement or a stipulation contained in a plea agreement (written or made orally on the record) is a stipulation for purposes of subsection (a) only if both the defendant and the government explicitly agree that the factual statement or stipulation is a stipulation for such purposes."  Here, the plea agreement stated that the defendant did not stipulate to the government's Guidelines calculation, which used the base offense level for obstruction of justice from Section 2J1.2(a).  However, the requirement that the parties stipulate both to the facts supporting the use of another Guidelines section and that those facts are sufficient to qualify for the use of that Guidelines section only applies to Section 1B1.2(a).  By its terms, the application note does not apply to Section 1B1.2(c).  <u>See</u> U.S.S.G. § 1B1.2 application note (". . . is a stipulation for purposes of

8

The defendant's allocution "specifically establish[d] the commission" of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2), which is an "additional offense" to his conviction for false statement, in violation of 18 U.S.C. § 1001.  USSG § 1B1.2(c).  In his allocution, the defendant stated that:

> In 2012, because of the pending SEC investigation of Och-Ziff, another person [i.e., Co-Conspirator 1] offered to write me a letter in order to memorialize an oral agreement we had in 2010.  The other person drafted the letter and put the 2010 date on it, which I knew would create the false impression to the government investigators that the . . . agreement had been documented in writing at that time.  The letter was responsive to subpoenas the SEC served on Och-Ziff and me in 2012.  And even though I knew the date on the letter was wrong, I provided a copy of the letter to an Och-Ziff lawyer and produced the letter to the SEC in response to the subpoena to me.  Then, when I was shown a copy of the letter in the May 2013 interview with government lawyers, I gave inaccurate answers.

(Plea Hearing Tr., Dkt. 52, at 26:25-27:15).  The facts in the defendant's allocution establish that he "corruptly" provided the Backdated Letter in response to SEC subpoenas with the knowledge that the government investigators would be left with the "false impression" that the date on the letter was accurate.  The defendant thereby "obstruct[ed], influence[ed], or impede[ed]" the SEC's investigation, which was an "official proceeding" under 18 U.S.C. § 1512(c)(2).  Accordingly, the Court should use Section 2J1.2(a) of the Guidelines to calculate the defendant's base offense level, which is 14.

III.    The Appropriate Sentence

Contrary to the defendant's assertions, given the seriousness of the conduct here and the defendant's continued efforts to minimize it, a sentence of probation is not sufficient to provide just punishment, promote respect for the law and effect adequate deterrence.  As the defendant acknowledges, the government's prosecution and his own guilty plea took a significant toll on his career and personal life.  However, the defendant's request for probation is telling, because it assumes that the collateral consequences here – loss of a job, disruption to one's home life – are somehow unique to the defendant.  The defendant mistakes paying a "significant financial price" for the conduct with paying a price for the conduct.  For would-be criminals like the defendant, who can buy their way out of most problems and do not need to work another day in their lives, the only meaningful deterrent is knowing that imprisonment is the price for obstructing justice.

---

subsection (a) only if . . ."); see also United States v. Lowe, 261 Fed. App'x 235, 237 (11th Cir. 2008) (finding that the amendment to the Guidelines which resulted in new application note requiring that both the defendant and government agree that stipulation will impact the Guidelines applied only to Section 1B1.2(a) and not to 1B1.2(c)).

A.    <u>The Applicable Law</u>

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented."  <u>Id.</u> at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A)    to reflect the seriousness of the offense, to promote respect  for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct; [and]

(C)    to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider."  <u>United States v. Alexander</u>, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

B.    <u>The Nature and Circumstances of the Offense Warrant a Guidelines Sentence</u>

The government respectfully submits that the nature and circumstances of the defendant's offense weigh heavily in favor of a Guidelines sentence.  <u>See</u> 18 U.S.C. § 3553(a)(1).  As an initial matter, the defendant's conduct in this case was, as he admits, "serious."  (Def. Mem. at 31).  However, in his sentencing submission, the defendant nonetheless

10

attempts to minimize his conduct by claiming that he "quickly recognized his error" after he made false statements in the May 2013 interview and pointing to other defendants, in unrelated matters, who received probationary sentences, calling such cases "similar." (See Def. Mem. at 25-29). Those cases, however, are all distinguishable. For example, in United States v. Rafal, 17-CR-10004 (D. Mass.), ECF No. 19 at 9-12, the defendant pled guilty pursuant to Fed. R. Crim. P. 11(c)(1)(C), and the Court imposed the non-custodial sentence called for under the plea agreement.[3] In United States v. Santiago, 13-CR-39 (S.D.N.Y.) ECF 144 at 11, a former Marine who was charged with false statements relating to a non-fatal shooting incident during a military deployment in Iraq lied during an interview in the immediate aftermath of the shooting and "retracted" his lie "within moments."[4] By contrast, the defendant here obstructed justice for over a year and only admitted his false statement because he had been caught by government investigators. In United States v. Schulte, 10-CR-455 (D. Colo.), the defendant received a probationary sentence after he was acquitted of numerous counts at trial but convicted of making false statements. Unlike here, the defendant in Schulte had not spent considerable time planning to lie to various government agencies before he was questioned. And he corrected his misstatements after reviewing his files – not because the investigators had suggested to him that he had been caught in a lie. In United States v. Bonds, 784 F.3d 582, 586, 589 (9th Cir. 2015) (per curiam), the Ninth Circuit reversed the defendant's conviction for obstruction of justice where the defendant's conviction was based solely on a "rambling" and "non-responsive" answer to a question during grand jury testimony that the court found was not "material." Indeed, the prosecution in the Bonds case expressly declined to seek a conviction on the grounds that the defendant's statement was actually false. Id. at 587. Finally, in United States v. Tomasetta, 10 CR 1205 (JSR) (S.D.N.Y.), ECF No. 294 at 5, the government recommended probation, in part, because the defendants had "already withstood two lengthy trials on securities fraud charges" that resulted in mistrials. None of those circumstances are present here.

Moreover, the defendant' memorandum largely ignores that his obstructive conduct occurred over the course of 14 months and only ended when the defendant realized he had been caught lying to "ten agents and lawyers [who] attended on behalf of the government." (Def. Mem. at 21). As the defendant admitted at the plea hearing, he produced the Backdated Letter in 2012 first to Och-Ziff and later to the SEC directly while knowing and intending that it would create the false impression that the letter was not backdated. By leaving the SEC with this false impression for months, the defendant interfered with a complicated and time-consuming investigation of the defendant's dealings with Co-Conspirator 1 in Libya and elsewhere. And, contrary to his suggestion otherwise, the defendant did not suddenly decide the day after the May 2013 interview that he should "[seek] to acknowledge" and "take responsibility" for his lies about the Backdated Letter because it was the right thing to do. (Def. Mem. at 25). Rather, the

---

[3]      Under the binding plea terms, which the court accepted, the defendant served 12 months' probation, which included four months of home detention. (ECF No. 13 at 1). The information filed in the case stated that the defendant had lied and misled the SEC about paying an unlawful $50,000 referral fee for obtaining a client. (ECF No. 1 at 1-3).

[4]      The defendant was originally charged with assault and making two counts of false statements, but the court dismissed the assault charge on due process grounds and a jury acquitted the defendant of the second false statement charge at trial. (ECF Nos. 54 and 93).

defendant decided to come clean only because, after hearing the government's questioning at the May 2013 interview, he knew he had been caught.

The investigation of financial crimes often necessitates interviews like the ones in which the defendant chose to lie to and mislead government investigators. The defendant had an attorney at his side and he was prepared in advance for both interviews. The government investigators asked questions that the defendant knew they would ask and he responded with lies. It takes a corrupt determination to stare down the FBI, IRS and SEC and deliver a false cover story two years in the making.

The defendant must have had a very important reason for lying about the Backdated Letter – a reason worth risking his hundred-million-dollar career and his own freedom to avoid being caught. That reason is the true nature and extent of the defendant's relationship and dealings with Co-Conspirator 1. That relationship touched Kazakh oil fields, central African natural resource projects, and, most importantly, Gaddafi's Libya. Some of what truly went on between the defendant and Co-Conspirator 1 was eventually laid to bare in the government's and SEC's charges against Och-Ziff. There were powerful reasons behind the defendant's lies, and that should give the Court some indication of the seriousness of the defendant's conduct.

C.     The History and Characteristics of this Defendant Warrant a Guidelines Sentence

The government respectfully submits that the defendant's history and characteristics weigh heavily in favor of a Guidelines sentence. See 18 U.S.C. § 3553(a)(1). The defendant has enjoyed a privileged life for decades – living at the top of London society and amassing a personal fortune. When he was interviewed by federal agents, it was about topics that few individuals can conceive being called to account for – questions about multi-hundred million dollar transactions and $18 million personal loans for yachts. The defendant's strong connections to family and friends are important but ultimately not remarkable. He has the financial means to provide an excellent upbringing for his family and even his conduct here puts none of that in jeopardy.

D.     The Need for Deterrence

The need to afford both adequate general and specific deterrence to criminal conduct favors a Guidelines sentence. See 18 U.S.C. §§ 3553(a)(2)(B), 3553(a)(2)(C). With respect to general deterrence, over the course of more than a year, the defendant created and then provided to the SEC a misleading document to obstruct an important government investigation, and then doubled-down by lying about that document. The enforcement of our laws depends on the integrity of a system in which everyone agrees to respond truthfully if summoned. The defendant's conduct served to erode that system. Often, obstruction of justice occurs to prevent the government from detecting more serious crimes. Because of the defendant's once prominent position in the finance industry, this case has generated media scrutiny and, without a term of incarceration, other would-be criminals will see the defendant's course and follow it themselves. See 18 U.S.C. § 3553(a)(2)(B).

For this particular defendant, he has lived two lives – one as a hard-working achiever and later as a proverbial master of the world. No fine can be imposed that will make

any dent on the defendant and no penalty will matter except incarceration.  Nothing less than a Guidelines sentence will be sufficient to deter the defendant from engaging in future criminal conduct.  See 18 U.S.C. § 3553(a)(2)(C).

IV.     Conclusion

        For the foregoing reasons, the government respectfully requests that the Court apply the Guidelines for obstruction of justice (USSG § 2J1.2), and impose a sentence within the resulting range of 10 to 16 months' imprisonment that is sufficient, but not greater than necessary, to achieve the goals of sentencing.  See USSG § 3553(a)(2).


                                        Respectfully submitted,

RICHARD P. DONOGHUE              ROBERT ZINK
United States Attorney                Chief, Fraud Section
                                         Criminal Division
                                         U.S. Department of Justice

By:  ___/s/_____       By:  ___/s/_____
     David Pitluck                    Gerald M. Moody, Jr.
     James P. McDonald           Trial Attorney
     Jonathan Lax                  U.S. Department of Justice
     Assistant U.S. Attorneys       (202) 616-4988
     (718) 254-7000


cc:     Defense Counsel (by e-mail and ECF)
        United States Probation Officer Gregory Giblin (by e-mail)